[Civ. No. 24690. Fourth Dist., Div. One. Jan. 4, 1983.]

JAMES G. COPPERNOLL, Plaintiff and Appellant, v.
BOARD OF DIRECTORS OF SAN DIEGO STATE UNIVERSITY
FOUNDATION, INC., Defendant and Respondent.

## COUNSEL

Verne R. Hubka for Plaintiff and Appellant.

McInnis, Fitzgerald, Rees, Sharkey & McIntyre and Marc O. Stern for Defendant and Respondent.

## OPINION

**STANIFORTH, J.**—James G. Coppernoll appeals the superior court's denial of his petition (Code Civ. Proc., § 1094.5) for writ of mandate. He alleged his termination of employment by the Board of Directors, San Diego State University Foundation, Inc. (Foundation) violated his procedural due process rights by denying him the opportunity for a fair hearing before discharge. The Foundation contends Coppernoll erroneously assumes he is a permanent state employee in seeking the protection of grievance procedures that do not apply to him.

Coppernoll's petition alleges the Foundation was formed as a nonprofit organization to manage major funds, grants-in-aid, endowments, gifts, bequests, trusts, loans and scholarships for California State University (University); as a result the Foundation has become indispensible to the budget management of the University. As an auxiliary organization of the University, the Foundation's conduct has become so intertwined with the University that its activity is "quasi-public." This "symbiotic" relationship and "close nexus" is the "functional equivalent of a public agency." From this sophistically established premise Coppernoll seeks to derive the rights to a fair hearing and opportunity to be heard before discharge. The trial court disagreed and denied the petition for writ, finding "I don't think there's any question that they [the Foundation] are not a public entity, and I so find."

### FACTS

From October 1978 until September 1980, Coppernoll was employed as "Grant and Contracts Administrator" by the Foundation. Coppernoll was then summarily discharged. His request for an administrative action review was denied pursuant to established Foundation procedures. Coppernoll's petition for

writ of mandamus followed alleging an unfair discriminatory refusal of his right to be heard without excuse, justification or substantial reason.

DISCUSSION

I

At trial, the parties were in sharp dispute as to whether the Foundation was a *public* entity. Coppernoll reasoned it met the description of a public agency as defined by Government Code section 20009. Government Code section 20009 defines "public agency" as "any city, county, district, other local authority or public body of or within this State." This statute is inapplicable to the Foundation, for it defines *status* for purposes of contracting with Public Employees Retirement System. (56 Ops.Cal.Atty.Gen. 250, 251 (1973).) Nor does Government Code section 811.2 apply which defines "public entity" as including "the State, the Regents of the University of California, a county, city, district, public authority, public agency and any other political subdivision or public corporation in the State."

Coppernoll offers neither statute not judicial precedent to support a finding the Foundation is a public or quasi-public entity within the definition of Government Code section 20009, subdivision (c), or section 811.2. Moreover, Coppernoll's theory on appeal is that the quasi-public status of the Foundation should be evaluated in light of the effect it has, and the benefits it confers, upon the University.

The cases and authorities cited by both Coppernoll and the Foundation suggest that *auxiliary* organizations such as the Foundation are not part of the state body which they aid or assist. (See 47 Ops.Cal.Atty.Gen. 8-11 (1966); 47 Ops.Cal.Atty.Gen. 70-73 (1966).) In *Wanee* v. *Board of Directors* (1976) 56 Cal.App.3d 644, 646-647 [128 Cal.Rptr. 526], the manager of the student book store at the California State University at Chico was terminated without cause. The appeal court held, as an employee of an auxiliary organization, Wanee was not entitled to the dismissal protections afforded employees of the university.

It is Coppernoll's position that the legal precedents cited are not applicable to his case because no inquiry there was made into "the primary benefit" of the functions to be performed by the book store, the name "auxiliary organization" was sufficient on its face to preclude any trial court inquiry into the agency's dismissal practices.

Coppernoll posits three arguments in support of his position. He points to the 12 functions allocated by Administrative Code, title 5, section 42500 as appropriate for auxiliary organizations at state colleges and universities. These

functions encompass an entire spectrum of operations ranging from operating trailer courts and dormitories, farms, book stores, cafeterias, orchards, and livestock projects, to handling funds, grants and documents and trusts.

According to Coppernoll the "primary benefit" of each of these functions may go to the students, or faculty, or community or the University. Of these 12 functions, Coppernoll submits the primary benefits of 10 do not go directly to the University·but rather to the students, faculty or community. The two remaining functions, items 6 and 11 (loans, scholarships and grants-in-aid and gifts, bequests, devises and endowments), however, primarily benefit the University. Coppernoll argues a "primary benefit" test would apply only to the auxiliary organizations (foundations) performing functions number 6 and 11. These functions are in issue here but were not in issue for example in *Wanee, supra.*

Secondly, argues Coppernoll, the auxiliary function here under scrutiny may be distinguished from others by the *practical effect* of its application or operation on the university. The effect of a particular function as applied to the parent will differ markedly. In 1959 the state Senate recognized this problem. After investigation it required direct state responsibility for regulating auxiliary foundations and more stringent controls, funding regulations and fiscal management.

Thirdly, Coppernoll argues the species of foundation here involved is to be distinguished by analyzing its practical effect on the parent organization if hypothetically the auxiliary organization were terminated or dissolved. Coppernoll assumes if the functions performed by the auxiliary organizations which are primarily for the benefit of .the students, faculty or community are terminated, only minor changes would be required by the University. No major reorganization would occur if such auxiliary organization were terminated, however, because these functions would be provided by some off-campus association or facility.

On the other hand if there were a termination of the functions listed in 6 or 11 above, a major reorganization would have to be effected within the University itself. The University would necessarily have to create a new substructure within itself to perform the same functions since these functions would probably not be delegated to an off-campus, commercial, private or contract agent. Coppernoll points to the fact that the Attorney General and the state Senate have already investigated the adverse result of unregulated control of matters in this area and asks us to test the species of functions of auxiliaries set forth in the Attorney General's opinion and in the *Wanee* case by these standards: The results are the same he argues except when it is applied to the Foundation here then a different result obtains. Thus Coppernoll argues that the Foundation should be

considered quasi-public and regulations applying to public agencies should control.

Determining whether the Foundation is a public or quasi-public entity, whether it may or may not have a symbiotic "relationship" with the University, does not resolve the problem presented here. The legal interrelation of the Foundation and University and any differential treatment of employees, permanent or temporary, are, unless constitutional nerves are touched, for legislative determination.

## II

California Education Code section 89900, subdivision (c), declares operation of auxiliary organizations shall be conducted in conformity with regulations established by the trustees. These regulations must conform to certain specific statutory directives requiring *comparability* of working conditions. *"The regulations shall include provisions requiring the governing board of each auxiliary organization to provide salaries, working conditions and benefits for the full-time employees of each auxiliary organization which are comparable to those provided California State University and Colleges employees performing similar services; provided, however, that the regulations may permit retirement benefits or permanent status benefits or both to be withheld from temporary and executive employees of each auxiliary organization,* and provided further that the regulations may exempt from the requirement of providing retirement benefits any auxiliary organization that is funded primarily by mandatory student fees collected by the trustees. For the purposes of this subdivision, *a temporary employee is* (a) an employee employed for a research project, workshop, institute, or other special project funded by any grant, contract or gift; or (b) *an employee whose contract of employment is for a fixed term not exceeding three years."* (Italics added.)

 The Foundation purported to act in accord with the foregoing statute when it resolved, effective July 1, 1978, to withhold permanent status benefits from employees such as Coppernoll. According to the declaration of Juanita Brents, Coppernoll was a "Group 5 employee" under the Foundation resolution. *As a group 5 employee he was not entitled to permanent status until completion of three successive years in this category.* Coppernoll had been employed for less than two years. The statute, however, requires that the auxiliary's regulations shall include provisions requiring the governing board of each auxiliary to provide salaries, working conditions and benefits for full-time employees of each auxiliary organization which are comparable to those provided by California State Universities and Colleges employees. Thus *"full-time employees"* of the auxiliary are entitled by statute to the same benefits as similarly situated California State University employees.

The exceptions in the statute permit withholding of permanent retirement benefits or permanent status from *temporary or executive* employees of each organization. A temporary employee is defined in the statute "employed for a research project, . . . or other special project funded by any grant . . . ; or (b) an employee whose contract of employment is for a fixed term not exceeding three years." (Ed. Code, § 89900, subd. (c).) Coppernoll's employment contract specified he was a *"regular employee"* "with an *indefinite term."* Thus Coppernoll was not an employee (in the language of the exception spelled out in the statute) "for a fixed term not exceeding three years" but rather he was employed for an "indefinite term."

██ The term "indefinite" when used in conjunction with hiring or employment does not mean a "temporary" employment. A temporary employment is one which is foreseeably for a short period of time or for a fixed duration. (*Boone* v. *United States* (5th Cir. 1973) 482 F.2d 417, 419 and cases cited.)

In contrast, an indefinite employment is one where the prospect is that the work will continue for an indeterminate or substantially long period of time. (*Boone* v. *United States, supra,* at p. 419; *Frederick* v. *United States* (8th Cir. 1979) 603 F.2d 1292, 1296; *Kasun* v. *United States* (7th Cir. 1982) 671 F.2d 1059, 1061; *Born* v. *Allen* (D.C.Cir. 1960) 291 F.2d 345, 351.)

Thus, an employment which merely lacks permanence is "indefinite" rather than temporary unless termination is foreseeable within a short period of time. (*Boone* v. *United States, supra,* 482 F.2d at pp. 419-420, fn. 4.)

██ Coppernoll as a full-time employee of the Foundation for an indefinite period does not fall within the specific exclusionary provisions of the statute defining a "temporary employee." Under the general rule of statutory construction (*expressio unius*), Coppernoll is not a temporary employee because he is not so defined. (*People* v. *One 1941 Ford 8 Stake Truck* (1945) 26 Cal.2d 503, 506 [159 P.2d 641].)

The Foundation has endeavored by its regulations to prevent persons such as Coppernoll from becoming "permanent" employees and therefore having rights "comparable" to similarly situated employees of the University. It has attempted to do so by specifying in its condition of employment contract: "Because of the nature of sponsored programs, employees may be terminated at any time, with or without cause, whether they are classified by the Foundation as 'regular' or 'temporary.' Foundation employees are not State employees, they do not attain tenure or permanent status." This condition of employment would appear to be contrary to the express grant of rights contained in Education Code section 89900, subdivision (c), requiring that employees of the Foundation be given comparable working conditions, etc. to those provided by

the University. To the extent that the Foundation regulations or conditions of employment would contravene or diminish those rights so specified they would be void as contrary to the statute. (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 681 [94 Cal.Rptr. 279, 483 P.2d 1231]; *Rumford* v. *City of Berkeley* (1982) 31 Cal.3d 545, 555 [183 Cal.Rptr. 73, 645 P.2d 124].) Working conditions "comparable" to that of a full-time regular employee of the university would encompass a due process hearing before discharge. Coppernoll has been denied such right.

Judgment reversed with directions to the trial court to grant the writ of mandate as prayed.

Brown (Gerald), P. J., and Cologne, J., concurred.