[No. F037383. Fifth Dist. July 16, 2001.]

CALIFORNIA STATE UNIVERSITY, FRESNO ASSOCIATION, INC., Petitioner, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
McCLATCHY COMPANY, Real Party in Interest.

[No. F037418. Fifth Dist. July 16, 2001.]

THE BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY et al., Petitioners, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
McCLATCHY COMPANY, Real Party in Interest.

814

**COUNSEL**

McCormick, Barstow, Sheppard, Wayte & Carruth, Lowell T. Carruth and Christopher S. Hall for Petitioner California State University, Fresno Association, Inc.

Susan Westover for Petitioners Board of Trustees of the California State University et al.

No appearance for Respondent.

Dietrich, Glasrud, Mallek & Aune, Donald H. Glasrud and Bruce A. Owdom for Real Party in Interest.

Levy, Ram, Olson & Rossie, Karl Olson and Joni S. Jacobs for California Newspaper Publishers Association as Amicus Curiae on behalf of Real Party in Interest.

## Opinion

**WISEMAN, J.**—California State University, Fresno proposed a $103 million multipurpose arena on its campus, the Save Mart Center, to be funded primarily by private donations and operated by a University-affiliated, nonprofit auxiliary corporation, California State University, Fresno Association, Inc. (Association). In exchange for a generous gift to the California State University, Fresno Foundation (Foundation), also a University-affiliated auxiliary corporation, donors may obtain luxury suites in the arena for five-, seven- or ten-year terms. The donors enter into license agreements with the Association for use of the luxury suites. Some of the donors who obtained luxury suites requested to remain anonymous.

The McClatchy Company, doing business as the Fresno Bee (McClatchy), requested documents from the University, pursuant to the California Public Records Act (CPRA), concerning the identity of the individuals and/or companies that purchased luxury suites in the arena. The University denied the request, and McClatchy filed a petition for writ of mandate. Respondent court ordered the University and the Association to disclose the identities of the undisclosed licensees and to produce the license agreements.

The Board of Trustees of the University and John Welty, the University's president (collectively referred to as the University), and the Association filed petitions for writ of mandate challenging the respondent court's order, which has been stayed pending resolution by this court. Having reviewed the matter, we deny the University's writ petition, but grant the Association's writ petition and direct respondent court to vacate that portion of its order commanding the Association to disclose the identities of the undisclosed licensees and to produce the license agreements. Respondent court's order remains unchanged with respect to the University. The time has come to disclose the requested documents.

### Procedural and Factual Histories

The Save Mart Center will house the University's sports teams, including basketball, volleyball and wrestling, and will be a venue for community concerts, cultural events, educational conferences and graduation ceremonies. It will seat 16,000 for sporting events and 18,000 for concerts and stage

events. The plans call for state-of-the-art classrooms, computer rooms and conference rooms, with an anticipated date of completion in the fall of 2002.

The estimated cost of the Save Mart Center is approximately $103 million. The State of California contributed approximately $8 million for preplanning and design costs and off-site improvements to the roads and freeways providing access to the site. The remainder of the funding is from private donations. Save Mart Supermarkets and Pepsi Bottling Group together pledged a $40 million sponsorship gift, payable over 20 years.

The Save Mart Center will feature 32 luxury suites available for use by purchasing a license. Each suite will have 18 seats, a private restroom, refrigerator, wet bar, television monitors and Internet access. Prices for the suite licenses range from $45,000 to $63,000 per year, and license terms are five, seven and ten years. The suite licenses are expected to generate approximately $1.5 million annually for the construction and operation of the Save Mart Center. The University considers the license fees to be charitable donations, the majority of which are tax deductible.

The license agreements are entered into between the donors, "licensees," and the Association, "licensor." The agreements state, in relevant part:

"I. TERM

"Licensor does hereby grant the privilege of use to Licensee, and Licensee accepts that certain space shown on Exhibit 'A' and . . . known as Preferred Seating Area (PSA) No. _____ (the 'Premises') located in the structure commonly known as the Save Mart Center . . . for _____ consecutive terms commencing on 2002 and expiring on _____, (the 'Term') unless terminated sooner as provided herein . . . .

"II. CONSIDERATION

"Licensee hereby acknowledges that the privilege of use granted by Licensor in the Agreement is based upon annual execution of the terms of Licensee's Pledge Agreement between Licensee and [the Foundation] . . . ."

The Association is a California nonprofit corporation operating under Education Code section 89900 et seq., which addresses auxiliary organizations of state universities and colleges. The Association operates all the University's commercial enterprises, including the University's bookstore, food services, housing and student union. The Foundation is also a California nonprofit corporation operating under Education Code section 89900 et

seq. The purpose of the Foundation is to provide assistance to faculty and staff with the administration of grants, contracts and trust accounts. The Foundation manages all aspects of the financial activities for grants, contracts, trust accounts, investments, endowments, scholarships, loans, gifts and donations.

The Save Mart Center will be constructed and owned by the auxiliary corporations, not the University. The University will lease the land for the Save Mart Center to the Association, which will operate the facility. The Association was designated the official recipient of the funds obtained from suite licenses. However, payments for suite licenses are made to the Foundation and mailed to the University. The Association maintains the original license agreements. The University conceded at the hearing on McClatchy's petition that it has the names of the licensees, a concession supported by the record. The record also reveals that the University possesses, or did possess, copies of the license agreements.[1]

The University publicized the names of donors when it had their permission to do so. However, some donations to the Save Mart Center were made on the condition of anonymity. The University identifies several reasons donors may wish to remain anonymous, including pressures from competing charitable groups and potential family heirs. The University maintains that if certain donors cannot remain anonymous, they will withdraw their pledges. The University also speculates that the forced revelation of donor identities will have a chilling effect on future fundraising efforts.

According to the University's assessment of the economic and fiscal benefits of the Save Mart Center, construction will generate approximately 2,000 new full-time jobs, $188 million in construction expenditures, and $442,000 in local tax revenues. The University also claims the Save Mart Center's annual operations will support approximately 460 to 510 new full-time jobs, $20 to $24 million in new annual expenditures, and $281,000 to $340,000 in annual local sales and transient occupancy tax revenues. The University further maintains that the Save Mart Center will stimulate job creation and retention, enhance the workforce, diversify the economy, and provide additional educational opportunities for students.

---

[1] In its initial response to McClatchy's request for the license agreements, the University admitted the records were part of its donor files. It is also clear from press releases issued on University letterhead that the University has knowledge of the specific donations made by undisclosed licensees. It is reasonable to infer that such knowledge was obtained from the license agreements. Finally, in a pleading submitted in opposition to McClatchy's petition, the Association and the Foundation advised respondent court that the University may possess copies of the requested records.

On October 14, 1999, a news reporter with the Fresno Bee wrote to the president of the University, and requested "all documents in [his] or [his] office's possession relating to the identity of the people and/or companies who have purchased luxury suites in the Save Mart Center project at [the University] . . . . [and] the terms of their purchase contracts, including the length of the lease and the purchase price." On October 22, 1999, the University responded to the request, acknowledging it was made under the CPRA. The University concluded "the information . . . requested, to the extent, if any, that it is contained in state records, is 'official information,' and . . . the benefit to the public from non-disclosure outweighs the benefit to the public in disclosing it." The University further reasoned: "Donors expect that the University will keep their donations private. If the University were to be required to disclose this information, there is a very real possibility that it would lose the benefit of many donations. Loss of donations would work a great harm to the University and to the State, which supports it, and is therefore against the public interest."

On December 10, 1999, the attorneys for McClatchy wrote to the University requesting it reconsider its refusal to provide the requested documents. On December 20, 1999, counsel for the University reiterated the University's position that the records, to the extent they exist in state files, are protected from disclosure because the public interest in nondisclosure outweighs the public interest in disclosure.

On March 24, 2000, McClatchy filed a petition for writ of mandate pursuant to the CPRA against the University, the Association, and the Foundation to compel disclosure of the requested documents. As of August 2000, the University had received approximately $80 million in pledges. However, actual gifts received totaled only $12.6 million. The University contends that if fundraising efforts fall short of its goal, certain design features of the Save Mart Center will be eliminated and, if it is unable to make the down payment on construction costs, the entire project could be jeopardized.

The hearing on the petition was held on September 21, 2000.[2] On December 19, 2000, the court issued its ruling, finding, in pertinent part:

"4. The Petition for Writ of Mandate by [McClatchy] is granted as to [the University] . . . because:

---

[2]The Association requests us to take judicial notice of the reporter's transcript of the hearing. We need not take judicial notice of the transcript, since it is included in the record. (See Cal. Rules of Court, rule 56(c); Ct. App., Fifth Dist., Local Rules of Ct., rule 5, Writ petitions: Supporting records and stay requests.) The Association also requests us to take judicial notice of Education Code section 72670 et seq. and Education Code section 89900 et seq. We grant the request pursuant to Evidence Code section 451, subdivision (a).

"(a) [The University] is a state agency or state body within the meaning of [Government Code section] 6252(a);[3] [¶] . . . [¶]

"(c) [T]he writings that contain the names of the undisclosed licensees of the luxury suites and copies of the license agreements between the licensees and the Association that are in the possession of [the University] . . . are public records within the meaning of [section] 6252(e); and

"(d) [The University] . . . [was] not able to prove that the public interest in nondisclosure clearly outweighed the public interest in disclosure under [s]ection 6255.

"5. The Association must disclose the identities of the undisclosed licensees and the license agreements between the undisclosed licensees and the Association because:

"(a) [The University] is a state agency within the meaning of the [CPRA];

"(b) The Association is under the direct control of [the University] with respect to all of its activities (Ed. Code §§ 89900-89928 and 5 Cal. Code of Regs. 42400-42700);

"(c) The Association is required to advance the interest of [the University] in all of its activities which include the operation of Kennel Bookstore, University Food Services, University Courtyard, and the University Student Union. The Association will be required to do the same with respect to the Save Mart Center which it will operate on behalf of [the University] and the [University's] campus;

"(d) The Save Mart Center as planned will be an integral part of [the University] and the [University's] campus on which . . . it will be located;

"(e) The State of California has paid approximately $8,000,000 for off site improvements in connection with the Save Mart Center;

"(f) The Association will be performing a public function in operating the Save Mart Center;

"(g) The unidentified licensees will be deriving a significant and valuable benefit from the possessory interests they will have in the luxury suites at the planned Save Mart Center under the license agreements, over and above what other donors and members of the public will enjoy;

---

[3]All statutory references are to the Government Code unless otherwise indicated.

"(h) The undisclosed licensees and the executed license agreements between them and the Association are subject to disclosure under the Act (Accord *State ex. rel. . . . v. University of Toledo* [*Found.* (1992)] . . . [65 Ohio St.3d 258] 602 N.E. 2d 1159);

"(i) The disclosure of the identities of the undisclosed licensees is not a sufficiently serious invasion of their privacy to justify nondisclosure (*Poway Unified School District v. Superior Court* [(1998)] 62 Cal.App.4th 1496, 1505 [73 Cal.Rptr.2d 777])[;]

"(j) The Association was not able to carry the heavy burden that the public interest served by nondisclosure clearly outweighed the public interest served by disclosure under [s]ection 6255 . . . .

"6. The Petition for Writ of Mandate by [McClatchy] is denied as to the Foundation because the Foundation will not have a direct interest in the Save Mart Center and will not be performing a public function with respect to it. For purposes of this proceeding the Foundation is a private, nongovernmental, nonprofit corporation that is not governed by the [CPRA]."

On January 16, 2001, the Association filed a petition for writ of mandate and/or prohibition or other appropriate relief pursuant to section 6259, subdivision (c), and requested a temporary stay. On January 22, 2001, the University also filed a petition for writ of mandate and/or prohibition or other appropriate relief to review the order compelling disclosure of records under the CPRA, and requested a temporary stay. We stayed respondent court's December 19, 2000, order pending further order of this court, and directed McClatchy to file informal responses to the petitions. McClatchy filed preliminary oppositions to the petitions on January 31, 2001, and February 8, 2001.

On February 8, 2001, we issued orders to show cause why the relief prayed for in the Association's and the University's petitions should not be granted, and subsequently consolidated the two cases.

DISCUSSION

The University contends respondent court erred in concluding the documents sought by McClatchy are public records and are not exempt from disclosure under the CPRA. The Association also maintains the court erred

in finding the records not exempt, but initially argues it is not a state agency subject to the disclosure requirements of the CPRA.[4]

I. *Disclosure of public records under the CPRA*

We begin with an overview of the CPRA and the appropriate standard governing our review of the contentions made by the University and the Association.

A. *Basic principles of the CPRA*

The CPRA, codified at section 6250 et seq., provides for the inspection of public records maintained by state and local agencies. Section 6253 states, in pertinent part:

"(a) Public records are open to inspection at all times during the office hours of the state or local agency and every person has a right to inspect any public record, except as hereinafter provided. Any reasonably segregable portion of a record shall be available for inspection by any person requesting the record after deletion of the portions that are exempted by law.

"(b) Except with respect to public records exempt from disclosure by express provisions of law, each state or local agency, upon a request for a copy of records that reasonably describes an identifiable record or records, shall make the records promptly available to any person upon payment of fees covering direct costs of duplication, or a statutory fee if applicable. Upon request, an exact copy shall be provided unless impracticable to do so."

Section 6252, defines "state agency" and "public records":

"(a) 'State agency' means every state office, officer, department, division, bureau, board, and commission or other state body or agency, except those

---

[4]McClatchy argues the Association's petition should be summarily denied based on an improper verification. McClatchy recognizes that the petition, verified by the Association's attorney, fails to state why an officer of the Association did not verify it, as required by Code of Civil Procedure section 446. The claim lacks merit. As explained in *Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1498 [250 Cal.Rptr. 819]:

" '[W]hen an attorney has verified the pleading as within his own knowledge and also on information and belief but without stating the reason it was not verified by the party, the court may permit the pleading to stand. [Citations.]' [Citation.] [¶] . . . [¶]

"The object of a verification is to assure good faith in the averments or statements of a party. [Citations.] The absence of any complaint by real parties concerning verifying counsel's good faith renders this contention meritless."

agencies provided in Article IV (except Section 20 thereof) or Article VI of the California Constitution.[5] [¶] . . . [¶]

"(e) 'Public records' includes any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics. . . ."

■ The California Supreme Court in *CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 651-652, 656 [230 Cal.Rptr. 362, 725 P.2d 470] set forth the underlying policy of disclosure statutes:

"Implicit in the democratic process is the notion that government should be accountable for its actions. In order to verify accountability, individuals must have access to government files. Such access permits checks against the arbitrary exercise of official power and secrecy in the political process. However, a narrower but no less important interest is the privacy of individuals whose personal affairs are recorded in government files.

". . . The [CPRA] . . . was passed for the explicit purpose of 'increasing freedom of information' by giving the public 'access to information in possession of public agencies' [citation]. Maximum disclosure of the conduct of governmental operations was to be promoted by the [CPRA]. . . . [¶] . . . [¶]

"Disclosure statutes such as the [CPRA] and the federal Freedom of Information Act [(FOIA)] were passed to ensure public access to vital information about the government's conduct of its business." (*CBS, Inc. v. Block, supra*, 42 Cal.3d at pp. 651-652, 656, fns. omitted; see also § 6250 ["access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state"].)

The CPRA was modeled upon the FOIA (5 U.S.C. § 552 et seq.), and the two have a common purpose. As a result, "federal 'legislative history and judicial construction of the FOIA' may be used in construing California's Act. [Citation.]" (*City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1016 [88 Cal.Rptr.2d 552]; see also *Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1338 [283 Cal.Rptr. 893, 813 P.2d 240]; *County of Los Angeles v. Superior Court* (2000) 82 Cal.App.4th 819, 825 [98 Cal.Rptr.2d 564] [CPRA and FOIA have similar policy objectives and

---

[5]Article IV of the California Constitution relates to the Legislature, while article VI pertains to the judiciary.

should receive parallel construction].) However, the CPRA may not be construed to read into it FOIA language that the CPRA itself does not contain. (*County of Los Angeles*, at p. 825, fn. 4.)

B. *Standard of review*

■ The standard of review for orders under the CPRA was set forth in *City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at page 1016: "Pursuant to section 6259, subdivision (c), an order of the trial court under the [CPRA], which either directs disclosure of records by a public official or supports the official's refusal to disclose records, is immediately reviewable by petition to the appellate court for issuance of an extraordinary writ. [Citation.] The standard for review of the order is 'an independent review of the trial court's ruling; factual findings made by the trial court will be upheld if based on substantial evidence.' [Citation.]" (See also *Lorig v. Medical Board* (2000) 78 Cal.App.4th 462, 467 [92 Cal.Rptr.2d 862] [interpretation of CPRA and application of statute to undisputed facts is question of law subject to de novo review].)

With these principles in mind, we evaluate the parties' claims.

II. *Public records*

■ The University first contends that respondent court erred in finding the documents sought by McClatchy are public records subject to disclosure. We find no error.

The broad definition of public records in section 6252, subdivision (e), "is designed to protect the public's need to be informed regarding the actions of government, as expressed both in the [CPRA] and in the open meeting requirements of the Ralph M. Brown Act (§ 54950 et seq.). [Citation.] Indeed, secrecy is 'antithetical to a democratic system of "government of the people, by the people [and] for the people." ' [Citation.]" (*Poway Unified School Dist. v. Superior Court, supra,* 62 Cal.App.4th at p. 1501.)

■ We provided a more detailed analysis concerning the definition of public records under the CPRA in *Braun v. City of Taft* (1984) 154 Cal.App.3d 332, 340 [201 Cal.Rptr. 654]: "The mere custody of a writing by a public agency does not make it a public record, but if a record is kept by an officer because it is necessary or convenient to the discharge of his official duty, it is a public record. [Citation.] The court in *San Gabriel Tribune* [*v. Superior Court* (1983) 143 Cal.App.3d 762, 774 [192 Cal.Rptr. 415]] included in its discussion of what is a public record the following:

' " 'This definition is intended to cover every conceivable kind of record that is involved in the governmental process and will pertain to any new form of record-keeping instrument as it is developed. Only purely personal information unrelated to "the conduct of the public's business" could be considered exempt from this definition, i.e., the shopping list phoned from home, the letter to a public officer from a friend which is totally void of reference to governmental activities.' [Citations.]" [Citation.]' [Citation.]"

 In this case, we conclude the documents sought by McClatchy are public records. The requested documents are unquestionably "used" and/or "retained" by the University as required under section 6252, subdivision (e). In addition, they clearly relate to the conduct of the public's business, specifically, the operation of the Save Mart Center, a public facility on land owned by a public university. Further, the arena was financed, in part, by public funds to the tune of at least $8 million. (See *Connell v. Superior Court* (1997) 56 Cal.App.4th 601, 616-617 [65 Cal.Rptr.2d 738] [public has interest in records pertaining to government's conduct in managing public revenues].)

We reject the University's argument that the documents do not fall under the scope of the CPRA because no public revenue has been expended for the suite licenses. The Save Mart Center will be a public facility in which the public's business will be conducted. The word "public" means " 'of, pertaining to, or affecting, the people at large or the community.' " (*Coldwell v. Board of Public Works* (1921) 187 Cal. 510, 520 [202 P. 879].) As the University readily acknowledges, the Save Mart Center will significantly affect the community of Fresno.

III. *"State agency"*

 We turn now to the Association's contention that it is not a state agency for purposes of the CPRA.

The Association is a University-affiliated, nonprofit auxiliary corporation. Education Code section 89901 identifies auxiliary organizations:

"As used in this article, the term 'auxiliary organization' includes the following entities:

"(a) Any entity in which any official of the California State University participates as a director as part of his or her official position.

"(b) Any entity formed or operating pursuant to Article 1 (commencing with Section 89300) of Chapter 3 [student body organizations].

"(c) Any entity which operates a commercial service for the benefit of a campus of the California State University on a campus or other property of the California State University.

"(d) Any entity whose governing instrument provides in substance both of the following:

"(1) That its purpose is to promote or assist any campus of the California State University, or to receive gifts, property, and funds to be used for the benefit of such campus or any person or organization having an official relationship therewith.

"(2) That any of its directors, governors, or trustees are either appointed or nominated by, or subject to, the approval of an official of any campus of the California State University, or selected, ex officio, from the membership of the student body or the faculty or the administrative staff of campus.

"(e) Any entity whose governing instrument provides in substance both of the following:

"(1) That its purpose is to promote or assist the trustees of the California State University, or to receive gifts, property, and funds to be used for the benefit of the trustees of the California State University or any person or organization having an official relationship therewith.

"(2) That any of its directors, governors, or trustees are either appointed or nominated by, or subject to, the approval of the trustees or an official of the California State University, or selected, ex officio, from the membership of the trustees or the administrative staff of the California State University.

"(f) Any entity which, exclusive of the foregoing subdivisions of this section, is designated as an auxiliary organization by the trustees." (Ed. Code, § 89901; see also Cal. Code Regs., tit. 5, § 42400.)

As noted by the Association, California courts have generally recognized that auxiliary organizations are not part of the state body they aid or assist. (See *Coppernoll v. Board of Directors* (1983) 138 Cal.App.3d 915, 918 [188 Cal.Rptr. 394]; *Wanee v. Board of Directors* (1976) 56 Cal.App.3d 644, 648-649 [128 Cal.Rptr. 526]; see also 47 Ops.Cal.Atty.Gen. 8 (1966) [state college bookstore and foundation not instrumentalities of state but auxiliary organizations of the college for Social Security purposes].) In *Wanee v. Board of Directors*, the court held that employees of a state university bookstore were not employees of the college or of any governmental entity,

but instead were employees of a private corporation. As a result, the manager of the bookstore had no right insulating him against a dismissal made in good faith but without cause. (56 Cal.App.3d at p. 649.)

The court in *Coppernoll v. Board of Directors, supra,* 138 Cal.App.3d 915, similarly addressed whether an employee of a state university foundation (a nonprofit auxiliary organization) was entitled to a due process hearing before he was discharged by the foundation. The court recognized that Education Code section 89900, subdivision (c), requires the operation of auxiliary organizations to conform to regulations established by the trustees. These regulations require the governing board of each auxiliary organization to provide comparable salaries, working conditions and benefits for its full-time employees to those given state university employees performing similar services. The court determined that comparable working conditions include a due process hearing before discharge, and the employee had been denied this right. (138 Cal.App.3d at pp. 920-922.)

Although of some assistance, these cases do not address whether state university auxiliary organizations are "state agencies" for purposes of the CPRA. In fact, we find no California cases on point. In addition, contrary to arguments by the Association, we find nothing in the legislative history of the Education Code sections relating to community colleges that assists in resolution of this question.

As a result, we examine case law from other states interpreting statutes that define covered public entities. In *4-H Road Com. v. W.Va. Univ. Foundation* (1989) 182 W.Va. 434 [388 S.E.2d 308], the Supreme Court of Appeals of West Virginia interpreted the meaning of West Virginia's Freedom of Information Act. It held that a nonprofit corporation formed by private citizens, pursuant to general corporation law, for the purpose of assisting a state university through fundraising was not a "public body." The court reasoned the corporation was not created by state authority and was not primarily funded by state authority as defined in the act. (*Id.* at pp. 311-312.)

In *State v. Nicholls College Foundation* (La.Ct.App. 1992) 592 So.2d 419, a Louisiana appellate court held that a university foundation's receipt of public funds alone did not make the foundation a "public body" subject to Louisiana's Public Records Act. (*Id.* at pp. 420-421.) In contrast, in *State ex rel. v. University of Toledo Found., supra,* 602 N.E.2d 1159, the Ohio Supreme Court held a private, nonprofit corporation that acted as a major gift-receiving and soliciting arm of a public university was a "public office"

subject to Ohio's statutory public records disclosure requirements. (*Id.* at pp. 1161-1165.)[6]

Unfortunately, once again these cases are of little help in determining the breadth of the term "state agency" under the CPRA. A look at how the other state statutes define a covered entity illustrates the point. West Virginia defines a "public body" to mean: "every state officer, agency, department, including the executive, legislative and judicial departments, division, bureau, board and commission; every county and city governing body, school district, special district, municipal corporation, and any board, department, commission, council or agency thereof; *and any other body which is created by state or local authority or which is primarily funded by the state or local authority.*" (W.Va. Code § 29B-1-2(3) (1966), italics added.)

Louisiana defines a "public body" to include an: "instrumentality of state . . . government, including a public or quasi-public nonprofit corporation, designated as an entity to perform a governmental or proprietary function." (See La. Rev. Stat. Ann. tit. 44, ch. 1, § 1.A.(1).)

Last, Ohio defines "public office" as: "any state agency, public institution, political subdivision, or any other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government." (Ohio Rev. Code Ann. § 149.011(A).) Although the courts' interpretations of the above statutory definitions are of some interest, they do not provide much assistance in deciding what a "state agency" is under the CPRA. As can readily be seen, these other states' statutory schemes cast a much broader net than the CPRA when defining a covered public entity. If anything, the comparatively narrow scope of the CPRA lends some credence to the Association's position that it is not a "state agency" under the CPRA.

In resolving this uncharted territory of legislative intent, we recognize the extent of the CPRA's coverage is a matter to be developed by the courts on a case-by-case basis. (See *Irwin Memorial, etc. v. American Nat. Red Cross* (9th Cir. 1981) 640 F.2d 1051, 1054 [each organizational arrangement must be examined in its own context].) ■ In attempting to divine how broadly the term "state agency" can be interpreted, we are limited by rules of statutory construction, recently articulated in *People v. Superior Court* (*Gary*) (2000) 85 Cal.App.4th 207, 213 [101 Cal.Rptr.2d 874]:

---

[6]Following Ohio's subsequent adoption of the Uniform Trade Secrets Act, the Ohio Supreme Court held that state universities can have trade secrets that are exempt from disclosure. (See *State ex rel. Besser v. Ohio State Univ.* (2000) 87 Ohio St.3d 535 [721 N.E.2d 1044, 1049-1051].)

" 'The court's role in construing a statute is to "ascertain the intent of the Legislature so as to effectuate the purpose of the law." [Citations.] In determining the Legislature's intent, a court looks first to the words of the statute. [Citation.] "[I]t is the language of the statute itself that has successfully braved the legislative gauntlet." [Citation.]

" 'When looking to the words of the statute, a court gives the language its usual, ordinary meaning. [Citations.] If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs. [Citations.]' [Citation.]" (*People v. Superior Court (Gary)*, *supra*, 85 Cal.App.4th at p. 213.)

At this juncture, it bears repeating that the CPRA defines a "state agency" to mean "every state office, officer, department, division, bureau, board, and commission *or other state body or agency* . . . ." (§ 6252, subd. (a), italics added.) There is some ambiguity in the phrase "other state body or agency." However, in resolving this ambiguity, we are bound to apply the plain meaning rule and determine what these words mean based on their ordinary usage. In doing so, we conclude a nongovernmental auxiliary organization is not a "state agency" for purposes of the CPRA. The words "state body" and "state agency" simply do not include a nongovernmental organization. Ironically, our conclusion might well be different if in defining the term "state agency," the CPRA had incorporated broad language like that employed in the statutory schemes enacted in West Virginia, Louisiana and Ohio.

Our decision is further supported by comparing the definition of "agency" under the FOIA with that of "state agency" under the CPRA. The FOIA defines "agency" to include "any executive department, military department, *Government corporation, Government controlled corporation*, or other establishment in the executive branch of the Government (including the Executive Officer of the President), or any independent regulatory agency." (5 U.S.C. § 552(f), italics added.) As a result, federal courts examine a number of factors that indicate federal control of an entity. These include the degree of federal supervision, the use of public buildings, the financial reporting and auditing requirements, the appointment power of federal officials to the board of the entity, and the entity's specific purposes. (*Irwin Memorial, etc. v. American Nat. Red Cross*, *supra*, 640 F.2d at p. 1057.)

The CPRA, in contrast, does not reference any "state corporation" or "state controlled corporation," despite the fact it was modeled on the FOIA. (See *Motorola Communication & Electronics, Inc. v. Department of General Services* (1997) 55 Cal.App.4th 1340, 1346, fn. 5 [64 Cal.Rptr.2d 477].)

Although the FOIA was amended in 1974, following the enactment of the CPRA, to expand the original definition of "agency" (see *Rocap v. Indiek* (D.C. Cir. 1976) 539 F.2d 174, 175), the California Legislature did not follow suit. We cannot "simply ignore the language used in attempting to determine what the Legislature intended since we are bound by the doctrine of stare decisis to first look to the words of a statute." (*People v. Superior Court (Gary)*, *supra*, 85 Cal.App.4th at p. 214; see also *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

We are fully cognizant of the fact that our conclusion seems to be in direct conflict with the express purposes of the CPRA—"to safeguard the accountability of government to the public . . . ." (*Wilson v. Superior Court* (1996) 51 Cal.App.4th 1136, 1141 [59 Cal.Rptr.2d 537].) The Legislature's decision to narrowly define the applicability of the CPRA, balanced against its sweeping goal to safeguard the public, leaves us scratching our judicial heads and asking, "What was the Legislature thinking?" In many ways, the Association can be characterized as a "state-controlled" corporation that should be subject to the CPRA. (See *Eisen v. Regents of University of California* (1969) 269 Cal.App.2d 696, 703, 706 [75 Cal.Rptr. 45, 37 A.L.R.3d 1300] [people have right to know identity and respective officers of student organization that might be using publicly financed and owned campus facilities of university].) However, courts "do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature." (*Estate of Horman* (1971) 5 Cal.3d 62, 77 [95 Cal.Rptr. 433, 485 P.2d 785].) The rewriting of a statute is a legislative, rather than a judicial function, a practice in which we will not engage. (*Hofer v. Young* (1995) 38 Cal.App.4th 52, 57 [45 Cal.Rptr.2d 27].)

In light of our decision, it is unnecessary to address the Association's remaining contentions. However, for purposes of the University's writ petition, we turn to whether the requested records are exempt from disclosure under the CPRA.

IV. *Exemption from disclosure*

The University argues that respondent court erred in concluding the documents sought by McClatchy are not exempt from disclosure. In taking this position, we presume the University does not challenge its status as a "state agency" under the CPRA. Thus, unless one of the exemptions outlined in the CPRA applies, the University must produce the requested documents. The University maintains the documents requested by McClatchy are exempt

from disclosure under the official information privilege, the constitutional rights of privacy and freedom of association, and the public interest "catch-all" exception.

█ The CPRA embodies a strong policy in favor of disclosure of public records, and any refusal to disclose public information must be based on a specific exception to that policy. (*Lorig v. Medical Board, supra,* 78 Cal.App.4th at p. 467; *Cook v. Craig* (1976) 55 Cal.App.3d 773, 781 [127 Cal.Rptr. 712].) Statutory exemptions from compelled disclosure are narrowly construed. (*City of Hemet v. Superior Court* (1995) 37 Cal.App.4th 1411, 1425 [44 Cal.Rptr.2d 532].)

█ The court in *City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at pages 1017-1019, set forth the law governing exemptions to the general policy of disclosure:

"Disclosure of public records . . . involves two fundamental yet competing interests: (1) prevention of secrecy in government; and (2) protection of individual privacy. [Citation.] Consequently, both the FOIA and the [CPRA] expressly recognize that the public's right to disclosure of public records is not absolute. . . . [T]he [CPRA] includes two exceptions to the general policy of disclosure of public records: (1) materials expressly exempt from disclosure pursuant to section 6254; and (2) the 'catchall exception' of section 6255, which allows a government agency to withhold records if it can demonstrate that, on the facts of a particular case, the public interest served by withholding the records clearly outweighs the public interest served by disclosure. [Citation.] [¶] . . . [¶]

█ "The burden of proof is on the proponent of nondisclosure, who must demonstrate a 'clear overbalance' on the side of confidentiality. [Citations.] The purpose of the requesting party in seeking disclosure cannot be considered. . . . It is also irrelevant that the requesting party is a newspaper or other form of media, because it is well established that the media has no greater right of access to public records than the general public. . . .

"Thus, in determining whether public records which are not expressly exempted from disclosure must be disclosed over the government's objection, California courts apply the section 6255 balancing test for the catchall exception on a case-by-case basis. Where the public interest in disclosure of the records is not outweighed by the public interest in nondisclosure, courts will direct the government to disclose the requested information. [Citations.]

"Conversely, courts have upheld the government's refusal to release public records when the public interest in nondisclosure clearly outweighed

the public interest in disclosure. [Citations.]" (*City of San Jose v. Superior Court, supra*, 74 Cal.App.4th at pp. 1017-1019, fns. omitted; see also *Poway Unified School Dist. v. Superior Court, supra*, 62 Cal.App.4th at p. 1501.)

## A. *Section 6254, subdivision (k) exemption*

 Section 6254 exempts several types of records. Subdivision (k) of section 6254 exempts "[r]ecords the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege." Here, the University relies on Evidence Code section 1040 and the constitutional rights of privacy and freedom of association.

Evidence Code section 1040 creates a privilege for official information acquired in confidence if "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ." (Evid. Code, § 1040, subd. (b)(2); see also *CBS, Inc. v. Block, supra*, 42 Cal.3d at p. 656.) "This privilege must be 'applied conditionally on a clear showing that disclosure is against the public's interest.' [Citation.]" (*CBS, Inc.*, at p. 656.)

However, it is unnecessary to specifically address this exemption in light of our holding under the section 6255 catchall exception. As explained by the California Supreme Court in *CBS, Inc. v. Block, supra*, 42 Cal.3d at page 656: "The weighing process mandated by Evidence Code section 1040 requires review of the same elements that must be considered under section 6255 [citation]. Therefore, it is consistent with the [CPRA]. Under this privilege, the burden of demonstrating a need for nondisclosure is on the agency claiming the right to withhold the information. [Citation.] Thus, this court's rejection of the claim of exemption under section 6255 on the ground that the public interest weighs in favor of disclosure similarly requires rejection of the claims of exemption under section 6254, subdivision (k) and Evidence Code section 1040." (See also *American Civil Liberties Union Foundation v. Deukmejian* (1982) 32 Cal.3d 440, 446-447, fn. 6 [186 Cal.Rptr. 235, 651 P.2d 822].)

Similarly, it is also unnecessary, in light of our analysis under section 6255 below, to address the University's claim that the records are exempt from disclosure under the constitutional rights of privacy and freedom of association. (See *CBS, Inc. v. Block, supra*, 42 Cal.3d at pp. 655-656; *City of San Jose v. Superior Court, supra*, 74 Cal.App.4th at p. 1017 [recognizing that "[p]ublic records can include 'personal details about private citizens,'

and disclosure may infringe upon privacy interests"]; *Black Panther Party v. Kehoe* (1974) 42 Cal.App.3d 645, 651-653 [117 Cal.Rptr. 106].)

Therefore, we turn to the catchall exception under section 6255.

B. *Section 6255 catchall exception*

Section 6255, subdivision (a), states: "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." Here, we conclude the public interest in disclosure of the records is not outweighed by the public interest in nondisclosure.

We find the arguments advanced by McClatchy, advocating the public interest in disclosure, to be compelling. The Save Mart Center utilized public funds for a public multipurpose arena on land owned by a public university. The public should be able to determine whether the purchase price for luxury accommodations in the arena is a fair and reasonable return on its contribution to the project. In other words, disclosure allows the public to discern whether its resources have been spent for the benefit of the community at large or only a limited few. The public should also be able to determine whether any favoritism or advantage has been afforded certain individuals or entities in connection with the license agreements, and whether any discriminatory treatment exists. Determinations pertaining to the public's business cannot be made without disclosure of the identities of the licensees and the license agreements. (See *New York Times Co. v. Superior Court* (1990) 218 Cal.App.3d 1579, 1585-1586 [268 Cal.Rptr. 21] [disclosure of users of excess water resources ensures individuals do not receive special privileges or, alternatively, are not subject to discriminatory treatment].)

The University suggests it can see no reasonable public interest in disclosure of licensee names. We beg to differ, and can conceive of many examples where the licensee's identity could be of significant interest to the public. For example, the Save Mart Center will presumably serve beer to attendees. If so, it is likely there will be a competitive bidding process for the contract to sell beer. One of the anonymous licensees could be a beer distributor. If so, the public has an interest in knowing the licensee's identity to determine whether that licensee is receiving special consideration in contract negotiations. On the other hand, we assume the Coca-Cola Company will probably not be serving its beverages at the Save Mart Center, and attendees will be hoisting cups of Pepsi Cola. The fact that Pepsi

Bottling Group made a very public multimillion-dollar contribution to the Save Mart Center helps the public understand and appreciate why Pepsi will likely be served at the Save Mart Center for a long time. On the other hand, if an anonymous licensee purchases a suite license for a much lesser sum, and somehow benefits from this financial contribution, the public has no way to determine whether the licensee has gained an unreasonable advantage at the expense of public dollars.

The University maintains that donors, particularly anonymous donors, have a right to privacy in their financial dealings. The University worries that if licensee names are made public, those individuals will be solicited by numerous charitable organizations, placed on countless mailing lists and targeted for donations by organizations of unknown or ill repute. We note there is no evidence in the record with respect to whether the undisclosed licensees are individuals or corporations. In any event, we find these alleged privacy violations to be minimal. McClatchy seeks only the names of the purchasers of the luxury suites and the license agreements. The license agreements identify the name of the licensee, the licensee's "preferred seating area number" in the arena, the term of the agreement, the licensee's address, and the amount of the annual purchase price for use of the suite. The agreements contain only basic contractual terms relating to the business of a public facility. McClatchy does not seek any personal financial information concerning the licensees.

In addition, this case is distinguishable from one in which individuals or companies donate unconditionally to the University in the traditional sense. The purchase of luxury suites is more akin to a commercial transaction. The luxury suites unquestionably have a valuable commercial benefit, since they may be used to attract and facilitate business contracts and transactions. Thus, we find the individuals who purchased luxury suites in the Save Mart Center, a public facility, entered into the public sphere. By doing so, they voluntarily diminished their own privacy interests. (See *Braun v. City of Taft*, *supra*, 154 Cal.App.3d at p. 347 [fact one "is engaged in the public's business strips him of some anonymity"]; *San Gabriel Tribune v. Superior Court*, *supra*, 143 Cal.App.3d at pp. 780-781 [voluntary entry into public sphere diminishes one's privacy interests].)

The University further asserts that large donations will be canceled if promises of confidentiality are breached. First, the University has set forth no competent evidence that licensees demanded, or University or Association personnel promised, confidentiality. The license agreements, themselves, contain no such provision, and also sport an integration clause. As a

result, any extraneous statements of University personnel not contained in the license agreements are irrelevant and likely violate the parol evidence rule. Second, any claims by the University that donations will be canceled are speculative, supported only by inadmissible hearsay. Statements by University personnel that disclosure of the licensees will "likely" have a chilling effect on future donations, resulting in a "potential" loss of donations, are inadequate to demonstrate any significant public interest in nondisclosure. (*CBS, Inc. v. Block, supra,* 42 Cal.3d at p. 652 ["mere assertion of possible endangerment does not 'clearly outweigh' the public interest in access to these records"]; *Connell v. Superior Court, supra,* 56 Cal.App.4th at pp. 612-613 [declarations failed to make particularized connection between documents subject to disclosure and ways in which disclosure would increase risk of counterfeiting].)

The unsupported statements constitute nothing more than speculative, self-serving opinions designed to preclude the dissemination of information to which the public is entitled. There is no admissible evidence in the record that any license agreements will be canceled if licensee names are disclosed to the public. Any genuine concerns of donor withdrawals should have been presented with competent evidence through an in camera hearing, which then could have been evaluated on appeal.

We disagree with the University's claim that McClatchy has alternate, less intrusive means of conducting its search for information. The University suggests that McClatchy launch a publicity campaign to elicit information from donors and "canvass" the luxury suites after the Save Mart Center is complete, to discern the identities of anonymous donors. The University's proposal is neither realistic nor sensible. Further, we suspect the licensees would be less than thrilled to have reporters lurking about their suites during events, asking questions of guests, and casting a pall over otherwise festive activities.

In short, the University has failed to meet its burden of demonstrating a " 'clear overbalance' on the side of confidentiality." (*City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at p. 1018; see also § 6255.) The requested documents now and formerly in the possession of the University must be disclosed, including electronic copies of such documents. (See *San Gabriel Tribune v. Superior Court, supra,* 143 Cal.App.3d at p. 774.)

#### DISPOSITION

Regarding the Association's writ petition, we issue a peremptory writ of mandate directing respondent court to vacate that portion of its December

19, 2000, order commanding the Association to disclose the identities of the undisclosed licensees and to produce the license agreements. The court shall enter an order denying McClatchy's petition for writ of mandate with respect to the Association. Costs are awarded to the Association against McClatchy.

With respect to the University's writ petition, the order to show cause is discharged and the petition for statutory writ of mandate and/or prohibition or other appropriate relief is denied. The University must disclose the identities of the undisclosed licensees and produce any copies, including electronic copies, of the license agreements now and formerly in its possession. Costs are awarded to McClatchy against the University.

The order staying the December 19, 2000, respondent court order is vacated upon finality of this decision.

Buckley, Acting P. J., and Cornell, J., concurred.

A petition for a rehearing was denied August 9, 2001.