Filed 8/1/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE BOARD OF PILOT COMMISSIONERS FOR THE BAYS OF SAN FRANCISCO, SAN PABLO AND SUISUN et al.,<br><br>     Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Respondent;<br><br>PACIFIC MERCHANT SHIPPING ASSOCIATION,<br><br>     Real Party in Interest. | A136803<br><br>(San Francisco City and County Super. Ct. No. CPF-12-512320) |
| SAN FRANCISCO BAR PILOTS et al.,<br><br>     Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Respondent;<br><br>PACIFIC MERCHANT SHIPPING ASSOCIATION,<br><br>     Real Party in Interest. | A136806<br><br>(San Francisco City and County Super. Ct. No. CPF-12-512320) |

The California Public Records Act (CPRA) (Govt. Code, § 6250 et seq.) provides for the inspection of public records maintained by state and local agencies. The Pacific Merchant Shipping Association (PMSA), real party in interest in this case, petitioned the

trial court for a writ of mandate compelling production under the CPRA of certain records held by Captain Bruce Horton, the then designated port agent of the Board of Pilot Commissioners for the Bays of San Francisco, San Pablo and Suisun (hereafter Port Agent and Board respectively). The trial court granted the petition. Horton, who also served as president of petitioner San Francisco Bar Pilots (Bar Pilots), seeks a writ of mandate and/or prohibition in this court directing the trial court to set aside its order. The Board separately challenges the trial court order. The Board, Horton,[1] and Bar Pilots all argue that the Port Agent is not a state officer subject to the CPRA, and that the records sought are private, not public.

We stayed the trial court's order and requested briefing. After consideration of the petitions, the opposition of PMSA, and the petitioners' replies, we ordered consolidation of the petitions and issued an order to the trial court to show cause why the relief requested should not be granted.[2] We now grant that relief, finding that, while the Port Agent is, for at least certain purposes, a public officer, PMSA has not established that the requested records are subject to the CPRA.

## I. BACKGROUND AND PROCEDURAL HISTORY

One of the first acts of the California Legislature in 1850 was to establish the Board. (Harb. & Nav. Code, § 1101, subd. (g).) The Board licenses and regulates pilots[3]

---

[1] By order of January 28, 2013, we accepted the parties' stipulation to substitute Peter McIsaac, the new president of Bar Pilots and current Port Agent, in place of Horton. Our references to the trial court record, however, necessarily refer to Horton in his then active capacities.

[2] On April 3, 2013, we granted the joint application of Los Angeles Times Communications LLC, California Newspaper Publishers Association, and McClatchy Newspapers, Inc. to submit briefing as amici curiae (collectively Amici Curiae) in support of PMSA.

[3] A ship's pilot is generally defined as a person duly qualified to conduct a ship into and out of a port or in special waters and who, while in charge, has the whole conduct of the ship's navigation. (Webster's 3d New Internat. Dict. (2002) p. 1716.)

2

on San Francisco Bay and its tributaries. (Harb. & Nav. Code, § 1100 et. seq.)[4] The Board presently consists of seven members, appointed by the Governor with the consent of the Senate, with two members required to be licensed pilots, two members representing the shipping industry, and three public members.[5] (Harb. & Nav. Code, § 1150.)

Bar Pilots is a private unincorporated association of pilots licensed by the Board. Piloting services are compulsory and monopolistic.[6] Subject to limited exceptions, pilots licensed by the Board have "exclusive authority . . . to pilot vessels from the high seas to Monterey Bay and the Bays of San Francisco, San Pablo, and Suisun and the ports thereof, and from those bays and ports to the high seas," as well as "exclusive authority to pilot vessels within and along the waters of those bays . . . ." (Harb. & Nav. Code, §§ 1125, subd. (a), 1132–1133.) Fees for most, but not all, pilotage services are set by statute. (See Harb. & Nav. Code, §§ 1190–1191.) Pilots are required to provide pilotage to vessels requiring a pilot (such as large container, cargo, military, and passenger cruise ships), and are subject to a fine and suspension or revocation of their license if they fail to do so. (Harb. & Nav. Code, § 1138.)

---

[4] "The Legislature finds and declares that it is the policy of the state to ensure the safety of persons, vessels, and property using Monterey Bay and the Bays of San Francisco, San Pablo, and Suisun, and the tributaries thereof, and to avoid damage to those waters and surrounding ecosystems as a result of vessel collision or damage, by providing competent, efficient, and regulated pilotage for vessels required by this division to secure pilotage services." (Harb. & Nav. Code, § 1100.)

"A program of pilot regulation and licensing is necessary in order to ascertain and guarantee the qualifications, fitness, and reliability of qualified personnel who can provide safe pilotage of vessels entering and using Monterey Bay and the Bays of San Francisco, San Pablo, and Suisun." (Harb. & Nav. Code, § 1101, subd. (e).)

[5] In 2009, the Legislature placed the Board under the authority of the Transportation Agency (formerly the Business, Transportation and Housing Agency). The secretary of that agency serves as an ex officio member of the Board. (Harb. & Nav. Code, § 1150, subd. (d).)

[6] Pilotage is one of the oldest recognized monopolies. (See *Steinhort v. Comr. of Internal Revenue* (5th Cir. 1964) 335 F.2d 496, 499.)

PMSA is a private maritime trade association composed of companies that own or operate ocean-going vessels in California waters. Its members pay fees for private pilot services rendered by members of the Bar Pilots. PMSA nominates the shipping industry representatives to the Board. (Harb. & Nav. Code, § 1150, subd. (a)(2).)

The Port Agent is a licensed pilot appointed by a majority of all licensed pilots, subject to confirmation by the Board. (Harb. & Nav. Code, § 1130; Cal. Code Regs., tit. 7, § 218, subd. (a).)[7] The Port Agent's duties are "to carry out the orders of the Board, under applicable laws, and to otherwise administer the affairs of the pilots" (Regs., § 218, subd. (a)), including general responsibility for the "supervision and management of all matters related to the business and official duties of pilots" (Harb. & Nav. Code, § 1130, subd. (b); Regs., § 218, subd. (b)) and the specific responsibility of assigning pilots to vessels (Regs., § 218, subd. (d)(1)). The Port Agent does not serve as a member or officer of the Board and receives no compensation from the Board (see Regs., §§ 206, 207); he does, however, have certain reporting obligations to the Board, including:

- Immediate notification of the Board's executive director of a suspected violation, navigational incident, misconduct, or other rules violation to which the Port Agent is a witness or receives a report. (Harb. & Nav. Code, § 1130, subd. (c).)

- Collection of data, preparation of accounts and making of payments to the Board required of pilots by statute and regulation, including the name, class, high gross tonnage and deep draft of each vessel subject to pilotage. (Regs., § 218, subd. (d)(4).)

- Reports of all accidents, groundings, collisions or similar navigational incidents involving a vessel to which a pilot has been assigned, as well as suspected pilot misconduct, including all pertinent details of the incident as set forth in the regulation. (Regs., § 218, subd. (d)(6).)

---

[7] All further references to Regulations are to title 7 of the California Code of Regulations.

- Reports of any matter that in the Port Agent's opinion affects the ability of a pilot to carry out his or her lawful duties. (Regs., § 218, subd. (d)(8).)

- Reports whenever any pilot is absent from duty because of illness lasting longer than seven days, including the nature of the illness, the probable duration of absence and the anticipated date of return to duty. (Regs., § 218, subd. (f).)

Beginning in July 2011, PMSA requested records regarding the Port Agent's assignment of pilots to ships transiting the San Francisco Bay. PMSA made document production requests to the Port Agent and to the Board in 2011 (Jul. 15, Aug. 30) and 2012 (Jan. 4, Mar. 26). At issue here are the latter two requests, which sought disclosure of what PMSA identifies as "Pilot Logs."

The January 4, 2012 request, from PMSA's counsel and directed to "Capt. Bruce Horton, Port Agent," made a CPRA request for "any and all documents written, utilized or kept current by the Port Agent, including those in electronic format, related to the following: [¶] The annual Pilot Log, which is a document created under the direction of the Port Agent as a memorialization of all pilot assignments to vessels made pursuant to the Port Agent's duties under [Regulations section] 218[, subdivision] (c)(1) [(current subd. (d)(1))] and reflects the administration of pilot vacation schedules pursuant to the Port Agent's duties under [Regulations section] 218[, subdivision] (c)(2) [(current subd. (d)(2))]." PMSA alleged that "[t]he annual Pilot Log is completed annually for each pilot in the normal course of affairs to effectuate the Board's requirement that all time be presented to the public pursuant to [Regulations section 237[, subdivision] (d) and, under certain circumstances, [Regulations section] 237[, subdivision] (f)(1)." Specifically requested were Pilot Logs for the years 2002 through 2011 for each pilot licensed during the years in question.

On February 22, 2012, Horton replied that "[t]here is no document maintained by the Port Agent named the 'Pilot Log.' There is a data set that bears headings that are similar to those set forth in your e-mail to [Board counsel] of January 30, 2012. This data, however, is not used by the Port Agent in assigning pilots to vessels or in preparing or administering the pilots' vacation schedule, nor are they supplied to [the Board] in

5

discharge of any obligation to the Board under the provisions of [Regulations] section 237[.] [¶] The documents containing this data are documents that are maintained by [Bar Pilots] in its capacity as a private organization and not in connection with any duties imposed upon the Port Agent by statute or by the regulations of [the Board].  For that reason, they are not disclosable under the [CPRA]."

The March 26, 2012 request was directed to the Board, and again sought production of the 2002–2011 Pilot Logs.  Demand was made for "all responsive documents in the [Board's] possession, custody and control, including but not limited to those which are in the possession of your Port Agent."  The request further defined a Pilot Log as "a multi-page document created at the direction of the Port Agent in the normal course of his business under [Harbors and Navigation Code section] 1130 and to keep track of a Pilot's time.  This document is described in proceedings before the United States Tax Court[8] as an annual 'Pilot Log,' which is a document created for each year as a memorialization of all pilot assignments to vessels made pursuant to the Port Agent's duties as further described at [Regulations section] 218[, subdivision] (c)(1) [(current subd. (d)(1))] and reflects the administration of pilot vacation schedules pursuant to the Port Agent's duties under [Regulations section] 218[, subdivision] (c)(2) [(current subd. (d)(2))].  The Pilot Log is completed annually for each pilot in the normal course of affairs to effectuate the Board's requirement that all time be presented to the public pursuant to [Regulations section] 237[, subdivision] (d) and, under certain circumstances, [Regulations section] 237[, subdivision] (f)(1)."  PMSA further asserted that a Pilot Log "is created in part to comply with the [Board's] requests to provide the amount of Minimum Rest Period ('MRP') exemptions taken by each [Bar Pilots'] pilot.  An MRP exemption occurs when there is less than twelve hours between the time a Pilot's turn ends (work shift ends) (represented on the pilot log under the heading 'BoB') and the

---

[8] These tax proceedings, *Miller v. C I.R.* (2011) 102 T.C.M. (CCH) 250 (*Miller*), are discussed *post*.

6

time the Pilot's next turn begins (work shift begins) (represented on the pilot log under the heading 'Ride')."

On April 5, 2012, the Attorney General, as counsel for the Board, responded that "The document you describe is not in the possession of [the Board]. If the 'Pilot Log' exists, it is not a document prepared, owned, used or retained by [the Board]. The letter to you dated February 22, 2012, from Capt. Bruce Horton, the Port Agent, which you attached to your request, states that he does not maintain a document called the 'Pilot Log[.]' In any case, the Board's files do not contain such a document. [¶] You state in your letter that the Board is required to produce documents that it does not possess because such documents are maintained by Captain Horton, who serves as Port Agent and also as President of [Bar Pilots], a private organization. To the extent that Captain Horton possesses documents that are producible under the [CPRA], he is subject to a direct request under the [CPRA]."

On July 3, 2012, PMSA filed a "Verified Petition for Writ of Mandate Directed to the Board of Pilot Commissioners and its Port Agent Ordering Compliance with the [CPRA]." PMSA sought a peremptory writ directing the Board and Horton, in his capacity as Port Agent, to disclose the Pilot Logs. The trial court permitted Bar Pilots and Horton, in his capacity as the president of Bar Pilots, to intervene in the action.

The answer to the trial court mandate petition again denied that the Port Agent or Bar Pilots had or maintained a Pilot Log. On August 15, 2012, Horton submitted a declaration under penalty of perjury averring that "[t]he Bar Pilots do not maintain any record or records entitled 'Pilot Log' and have not done so at any time during my membership. The Bar Pilots maintain a dataset that includes some of the types of information PMSA apparently seeks through its requests for 'Pilot Logs.' I do not use this dataset in performing my duties as Port Agent. The dataset is not provided to the Board or to members of the public."

On September 18, 2012, after hearing argument, the trial court granted the writ in part, finding that "The Port Agent is a public official; among other things, the position was created by the Legislature." The court observed that "[t]he problem here is that the

7

person who acts as Port Agent has *both* a private and public incarnation . . . and is at least confirmed by the Board which in turn operates under state law to (i) regulate the actions of pilots and (ii) a wide variety of other things in the public interest. [Citations.] [¶] The 'Pilot Logs' are documents used by the Port Agent in the execution of his public duties including, but not limited to, assigning pilots to vessels and preparing and administering pilot vacation time. These are necessary and convenient to the Port Agent's public duties and are public documents. [Citation.]" The court ordered the Port Agent to, within 30 days, "produce, if extant, the requested 'Pilot Logs' from 2002 [through] 2011."[9] The court otherwise denied the petition.

On September 24, 2012, the executive director of the Board and its custodian of records, Allen Garfinkle, filed a declaration with the court, averring that that the Board did not have the requested Pilot Logs, that the Board does not prepare, own, use, or retain such documents, and that the Board "does not now, and never has, possessed the [Pilot Logs]."

On October 16, 2012, Horton submitted a declaration in response to the court's order, averring in pertinent part that: "3. A small amount of information from the records of the Bar Pilots is submitted to [the Board] in compliance with the Port Agent's reporting duties under the Board's regulations. As Port Agent, I maintain and control this information. The vast majority of the information in the Bar Pilots' records, however, is not submitted to the Board. I maintain and control this latter category of records solely in my private capacity as President of the Bar Pilots. [¶] . . . [¶] 5. Some but not all of the information that [PMSA] asserts is contained in the 'Pilot Logs' is used by the Bar Pilots in preparing the report that the Bar Pilots, not the Port Agent, is required to submit to the Board under [Regulations] section 237[, subdivision ](d) . . . . I do not use this information in performing my duties as Port Agent. Specifically, I do not use the information to assign pilots to vessels, and I do not use it to prepare or administer pilot

_____

[9] On October 5, 2012, the trial court extended the time to seek appellate review of its order until October 15, 2012.

8

vacation time. I am informed and believe that the information used by the Bar Pilots for preparing the report under [Regulations] section 237[, subdivision ](d) could be retrieved by submitting a query to the electronic database created and maintained by the Bar Pilots. Prior to receiving PMSA's document demands, I was unaware of the existence of the database. I do not use, and have never used, the database in my capacity as Port Agent. I am unaware of any previous Port Agent ever using the database for any purpose. I have never submitted a query to the database (or asked anyone to do so on my behalf) for any purpose, either in my capacity as Port Agent or in my private capacity as President of the Bar Pilots; to my knowledge, no previous Port Agent has ever done so."

The instant petitions for writ of mandate, seeking to vacate the order requiring production, were filed on October 15, 2012, by Bar Pilots, the Board, and Horton in his private and public capacities.[10] On October 17, 2012, we issued a temporary stay of the trial court's order and set a schedule for briefing. On December 27, 2012, we ordered the petitions consolidated and issued an order to show cause why the requested relief should not be granted.

## II. DISCUSSION

A. *The CPRA*

The CPRA "provides for the inspection of public records maintained by state and local agencies." (*California State University, Fresno Assn., Inc. v. Superior Court* (2001) 90 Cal.App.4th 810, 822 (*CSU*).) "The Legislature enacted the CPRA in 1968 to give the public access to information in possession of public agencies in furtherance of the notion that government should be accountable for its actions and, in order to verify accountability, individuals must have access to government files. [Citation.]"[11] (*Gilbert*

---

[10] An order of the trial court under CPRA, which either directs disclosure of records by a public official or supports the official's refusal to disclose records, is immediately reviewable by petition to the appellate court for issuance of an extraordinary writ. (Govt. Code, § 6259, subd. (c).) All further statutory references are to the Government Code unless otherwise indicated.

[11] "In 2004, California voters approved Proposition 59, which enshrined in the state Constitution the public's right to access records of public agencies. (Cal. Const.,

9

*v. City of San Jose* (2003) 114 Cal.App.4th 606, 610.)  "Disclosure statutes such as the [CPRA] and the federal Freedom of Information Act [(FOIA)] were passed to ensure public access to vital information about the government's conduct of its business."  (*CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 656.)  "The CPRA embodies a strong policy in favor of disclosing public records.  [Citations.]"  (*Dixon v. Superior Court* (2009) 170 Cal.App.4th 1271, 1275.)

"[T]he extent of the CPRA's coverage is a matter to be developed by courts on a case-by-case basis.  [Citations.]"  (*CSU, supra,* 90 Cal.App.4th at p. 828.)  "This decision-making process is an unavoidable consequence resulting from 'the "myriad organizational arrangements" adopted "for getting the business of the government done." '  [Citation.]  Therefore, each arrangement must be examined in its own context.  [Citation.]"  (*Irwin Memorial, etc. v. American Nat. Red Cross* (9th Cir. 1981) 640 F.2d 1051, 1054.)[12]

B.     *Standard of Review*

Interpretation of the CPRA and its application to undisputed facts is question of law subject to de novo review.  Factual findings made by the trial court will be upheld if based on substantial evidence.  (*Versaci v. Superior Court* (2005) 127 Cal.App.4th 805, 812.)

C.     *Is the Port Agent a Public Officer?*

" 'State agency' means every state office, *officer*, department, division, bureau, board, and commission or other state body or agency, except those agencies provided for

---

art. I, § 3, subd. (b) [requiring that 'the writings of public officials and agencies shall be open to public scrutiny'].) . . . The amendment requires the [CPRA] to 'be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access.' (Cal. Const., art. I, § 3, subd. (b), par. (2).)  [However, s]uch was the law prior to the amendment's enactment.  [Citation.]" (*BRV, Inc. v. Superior Court* (2006) 143 Cal.App.4th 742, 750.)

[12] The CPRA "was modeled on its federal predecessor, the [FOIA]," thus the legislative history and judicial construction of the FOIA "serve to illuminate the interpretation of its California counterpart.  [Citations.]" (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1338.)

in Article IV (except Section 20 thereof) or Article VI of the California Constitution." (§ 6252, subd. (f), italics added.)[13] "In attempting to divine how broadly the term 'state agency' can be interpreted, we are limited by rules of statutory construction . . . . [¶] ' "The court's role in construing a statute is to 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.]" ' " (*CSU, supra*, 90 Cal.App.4th at pp. 828–829.)

The Board and Bar Pilots do not deny that the Board itself is a state agency, but argue that the Port Agent does not meet any established criteria for being considered a state officer. The Port Agent is not among the Board's designated officers (see Regs., §§ 206, 207) and is employed and compensated by Bar Pilots, not by the public. The Port Agent is not among the civil executive officers enumerated in Government Code section 1001,[14] and is selected for the position by the Bar Pilots membership (apparently coextensive with his term as president), and is only "confirmed" by the Board, without any provision for his removal. (Harb. & Nav. Code, § 1130; Regs., § 218, subd. (a).) The Board suggests that the position of Port Agent is "best viewed as a liaison between the licensed pilots and the Board."

The trial court concluded that the Port Agent is a public official because, "among other things, the position was created by the Legislature." But the difficulty, as the trial court observed, is that the person acting as Port Agent "has *both* a private and public incarnation . . . ." Horton himself acknowledged, in his August 17, 2011 response to the CPRA request, that having one person in the "dual capacity" of both Port Agent and Bar Pilots president made it "sometimes difficult to distinguish between the 'private' and 'public' duties of the person who holds both positions."

---

[13] Articles IV and VI of the California Constitution deal with the legislative and judicial branches of government.

[14] As the Board notes in its petition, the no longer existent positions of "port warden" and "harbor commissioner" are among those listed in section 1001, but in contrast to the port agent, those positions were gubernatorial appointments for terms fixed by statute. (Former Pol. Code, §§ 368, 369, 2520.)

While the Port Agent, in his capacity as president of Bar Pilots, may have many entirely private duties and serve as "liaison" with the Board, he also has responsibilities imposed by statute and by administrative regulation. The Port Agent is charged with responsibility "for the general supervision and management of all matters related to the business and *official duties* of pilots." (Harb. & Nav. Code, § 1130, subd. (b); Regs., § 218, subd. (b), italics added.) The Port Agent's enumerated duties include assigning pilots to vessels. (Regs., § 218, subd. (d)(1).)

No California appellate court has yet addressed the question we confront here. However, at least one federal court has found the Port Agent to be acting as an officer or agent of the Board when assigning pilots to vessels, and consequently entitled to Eleventh Amendment governmental immunity from suit when performing this task. (*Regal Stone Ltd. v. Cota* (N.D.Cal. Sept. 7, 2010, Civ. A. No. 08-5098-SC) 2010 WL 3504846 (*Regal Stone*).) The *Regal Stone* litigation arose from the allision[15] of the M/V Cosco Busan with the San Francisco-Oakland Bay Bridge on November 7, 2007, spilling approximately 53,000 gallons of bunker fuel into the San Francisco Bay. The plaintiffs sued the pilot at the time of the accident, John Cota, McIsaac and his predecessor as Port Agent, Russell Nyborg, and Bar Pilots. Nyborg, McIsaac and Bar Pilots were alleged to have permitted Cota to continue to serve as a pilot when he was "medically unfit," and further alleged that McIsaac negligently failed to close the bar to vessel traffic in the face of unsafe weather conditions. Nyborg and McIsaac moved to dismiss the complaint, on the ground that they were state officials immune from suit. Under the Eleventh Amendment to the United States Constitution, "a state official is immune from suit in federal court for actions taken in an official capacity." (*California v. Deep Sea Research, Inc.* (1998) 523 U.S. 491, 502.) The motion to dismiss specifically alleged that "Captains McIsaac and [co-defendant] Nyborg, Port Agents of the [Board] *are such officials*." (Italics added.) Accepting this argument, and noting, as did the trial court here, that the

---

[15] The term "allision," as used in maritime accident cases, describes an accident involving a moving vessel and a stationary object or vessel. (*Hochstetler v. Board of Pilot Comrs.* (1992) 6 Cal.App.4th 1659, 1661, fn. 1.)

Port Agent "sometimes acts on behalf of the Bar Pilots, and sometimes on behalf of the Board," the court found that the plaintiffs' allegations against Nyborg and McIsaac "focus on conduct performed on behalf of the Board, not on behalf of the Bar Pilots." The court found that McIsaac and Nyborg were acting as officers or agents of the Board "as a matter of law" in supervision of Cota, and therefore immune from suit.

The Board and the Port Agent correctly note that a federal trial court decision has no precedential value. (*United Firefighters of Los Angeles County v. City of Los Angeles* (1989) 210 Cal.App.3d 1095, 1115.) PMSA cited the unpublished federal trial court decision in *Regal Stone* below, and cites it here as persuasive authority. (See *Pacific Shore Funding v. Lozo* (2006) 138 Cal.App.4th 1342, 1352, fn. 6 [unpublished federal cases are citable as persuasive, although not precedential, authority].) The Board and the Port Agent also contend that "entirely different legal standards" apply to the analysis of Eleventh Amendment sovereign immunity and application of the CPRA, but neither the Board nor the Port Agent attempt to articulate the purported analytical differences, and neither cite any authority for the argument.

We find the court's reasoning in *Regal Stone* to be persuasive in many respects. But we find it even more significant that it was the Port Agent (in that case McIsaac) who argued for immunity from suit based on his status as a government official when assigning or supervising pilots, insisting in his pleadings that "it is the Port Agent's official duty to assign pilots to vessels in accordance with the Board's guidelines," and specifically citing to Regulations section 218, former subdivision (c)(1) (current subd. (d)(1)).[16] The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, " 'prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 (*Jackson*).)

---

[16] As previously noted, Horton has also expressly acknowledged in this litigation that at least some of the duties performed by the Port Agent are "public."

13

" ' "[Judicial estoppel] is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. . . . 'The policies underlying preclusion of inconsistent positions are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings." ' . . . 'It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite.' [Citation.]" (*Jackson, supra,* 60 Cal.App.4th at p. 181.) " ' "Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [Citations.]" ' . . . The doctrine applies when: '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' [Citations.]" (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986–987.) All are true here.

At oral argument, both the Port Agent and the Board sought to distinguish the factual context of *Regal Stone*, and contended that it would be inequitable to apply the doctrine in this setting.[17] (See *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422–423 ["judicial estoppel is an equitable doctrine, and its application, even where all necessary elements are present, is discretionary" (italics omitted)]; *M. Perez Co., Inc. v. Base Camp Condominiums Assn. No. One* (2003) 111 Cal.App.4th 456, 463 [judicial estoppel is an equitable doctrine to protect against fraud on the courts].) But in *Regal Stone*, as in this matter, the Port Agent's role in the assignment of pilots, and whether he acts in an official capacity when doing so, was pivotal. And McIsaac took the unequivocal position before the U.S.

---

[17] The Board is, however, correct in its assertion that the doctrine cannot be applied to it, since it was not a party to the *Regal Stone* proceeding and has never adopted the position taken in that litigation by the Port Agent. We discuss separately, *post*, the Board's obligations under the CPRA.

14

District Court that he was a state official, acting with the course and scope of that capacity, when assigning pilots. We fail to appreciate the inequity in refusing to allow the Port Agent to take an inconsistent position here. The Port Agent fails to explain why one should be permitted to assume the cloak of a state official when it provides protection, but to then cast it off in the event it becomes burdensome. We find that the Port Agent must be considered a state officer, at least when performing the official duties provided by statute or Board regulation.[18]

D.      *Are the Pilot Logs Public Records?*

For purposes of the CPRA, a public record is defined as "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." (§ 6252, subd. (e).) "The definition is broad and ' " 'intended to cover every conceivable kind of record that is involved in the governmental process[.]' " ' [Citation.]" (*Coronado Police Officers Assn. v. Carroll* (2003) 106 Cal.App.4th 1001, 1006 (*Coronado Police Officers Assn.*).)

The January 4, 2012 CPRA request by PMSA's counsel to Horton first included a specific demand for production of "[t]he annual Pilot Log," alleging that it was "a document created under the direction of the Port Agent as a memorialization of all pilot assignments to vessels made pursuant to the Port Agent's duties under [Regulations section] 218[, subdivision] (c)(1) [(current subd. (d)(1))] and reflects the administration of pilot vacation schedules pursuant to the Port Agent's duties under [Regulations section] 218[, subdivision] (c)(2) [(current subd. (d)(2))]." The March 26, 2012 CPRA request to the Board mirrored this demand, and specifically referenced the United States Tax Court proceeding (*Miller, supra,* 102 T.C.M. (CCH) 250) in support of the request.

---

[18] PMSA appears to broadly suggest that the Port Agent should be considered a state official even when he is "administer[ing] the affairs of the pilots" or engaged in the "general supervision and management of all matters related to the business . . . of pilots." (Regs., § 218, subds. (a), (b).) We find no authority for such a sweeping assertion, but have no need to decide here the precise demarcation between the Port Agent's public and private roles.

15

PMSA contends that its records requests "seeks to shed light on the inexplicably murky process of assigning pilots to vessels" which PMSA alleges has been a "focal point of inquiry in litigation and policymaking at the federal and state level."[19] PMSA insists that the Pilot Logs are public records within the meaning of the CPRA "reveal[ing] pilot assignment and scheduling decisions made by the Port Agent when acting pursuant to Board regulation" and that such decisions "are critical to the provision of safe pilotage."

But the fact that the Port Agent may act as a public officer in the performance of certain of his duties does not mean that every record in his possession or control thereby becomes a public document subject to the CPRA. As we have discussed, the Port Agent has both private and public incarnations. Bar Pilots is an independent association, with its own facilities and its own records of its operations, and the Port Agent concurrently serves as president of that association. There is no contention that Bar Pilots is a public agency, or that its internal private records are subject to the CPRA, even though Bar Pilots makes required annual statistical reports to the Board, which are public record.

---

[19] It was the M/V Cosco Busan incident and questions as to the pilot's fitness that led to the Legislature placing the Board under the authority of the Transportation Agency. (Harb. & Nav. Code, § 1150, subd. (d).) The controversy here seems to be focused on the issue of requiring MRP's for pilots to avoid fatigue. A January 23, 2010 vessel incident in Port Arthur, Texas resulted in an investigation by the National Transportation Safety Board (NTSB) and recommendation that state licensing boards promulgate "hours of service" rules to prevent pilot fatigue. A legislative Joint Sunset Review Committee (Govt. Code, § 9147.7, subd. (c)), on February 5, 2012, recommended that the Board promulgate hours of service regulations for pilots in accordance with the NTSB report. The Board, on July 26, 2012, adopted additional reporting requirements for MRP's for pilots. Our Legislature recently amended the Harbors and Navigation Code to require the Board to "conduct a study of the effects of work and rest periods on psychological ability and safety for pilots" and make "recommendations on how to prevent pilot fatigue and ensure the safe operation of vessels." (Harb. & Nav. Code, § 1196.5, subd. (a).) Based on the results of the study, the Board will be required to "promulgate regulations for pilots establishing requirements for adequate rest periods intended to prevent pilot fatigue." (Harb. & Nav. Code, § 1196.5, subd. (b).) There are no current regulations on the subject. The Bar Pilots' work rules, calling for 12-hour MRP's, are only voluntary guidelines.

(Regs., § 237, subd. (d).)[20]  Private nongovernmental records are not subject to the CPRA.

"[T]he mere possession by a public [officer] of a document does not make the document a public record.  [Citation.]"  (*Coronado Police Officers Assn., supra,* 106 Cal.App.4th at p. 1006.)  " ' "Any record required by law to be kept by an officer, or which he keeps as necessary or convenient to the discharge of his official duty, is a public record."  [Citation.]' "  (*San Gabriel Tribune v. Superior Court* (1983) 143 Cal.App.3d 762, 774 (*San Gabriel Tribune*); see also *CSU, supra*, 90 Cal.App.4th at p. 824 [" 'if a record is kept by an officer because it is necessary or convenient to the discharge of his official duty, it is a public record' "].)  "[T]he critical question is whether the information contained therein relates to the conduct of the 'public's business.' "  (*Coronado Police Officers Assn.,* at p. 1006.)

In *Coronado Police Officers Assn.*, for example*,* a police officers' association sought to inspect a database compiled by the San Diego Public Defender's Office which included impeachment information gathered from client files, and "supplemented with information gathered from other public information sources, such as court files, civil service proceedings, peace officer reports and newspaper articles."  (*Coronado Police Officers Assn., supra,* 106 Cal.App.4th at p. 1004.)  Although the database was prepared, used and retained by a public agency, the Fourth District Court of Appeal held that that

---

[20] To assist the Board in determining the number of pilot's licenses to be issued, the Bar Pilots are required to provide a report that includes such information as:  numbers of vessel moves, bar crossings, bay and river moves; average draft and gross registered tonnage of piloted vessels; numbers of pilots reported sick or injured and the number of days each was unable to perform piloting duties; number of times a pilot resumed duties with less than 12 hours off duty, the contributing circumstances, and actual hours off duty between assignments; and number of days pilots were engaged in Board-mandated training or administrative duties authorized by the Port Agent.  (Regs., § 237, subd. (d)(1)–(12).)

the database was not a public record because it was compiled for use in its core private function, the representation of criminal defendants.[21] (*Id.* at pp. 1006–1007.)

In ordering disclosure, the trial court here found that "[t]he 'Pilot Logs' are documents used by the Port Agent in the execution of his public duties including, but not limited to, assigning pilots to vessels and preparing and administering pilot vacation time. These are necessary and convenient to the Port Agent's public duties and are public documents." Were this finding supported by substantial evidence, we would view it as dispositive. But we can find no competent evidence in the record before the trial court which would support such a finding.

     1.     *The Evidentiary Record*

The so-called Pilot Logs apparently first came to light in connection with a federal income tax dispute litigated between the Internal Revenue Service and an individual member of Bar Pilots (*Miller, supra,* 102 T.C.M. (CCH) 250). In that proceeding pilot Tom Miller, through counsel, joined in a written stipulation (*Miller* Stipulation), reciting that he was a "partner" in Bar Pilots.[22] The stipulation, dated October 18, 2010, included two exhibits (referred to in this litigations as the Pilot Logs) identified as "the [Bar Pilots] piloting record" for Miller for 2005 and 2006, and further described the documents as having been "created by [Bar Pilots] in the normal course of business to keep track of a Pilot's time pursuant to [Regulations section] 237[, subdivisions ](d), (f)(1)" and "to comply with [the Board's] requests to provide the amount of [MRP] exemptions taken by

---

[21] The court further found the database, even if it could be considered a public record, would be exempt from disclosure under the "catch-all" exemption under section 6255. (*Coronado Police Officers Assn., supra,* 106 Cal.App.4th at pp. 1012–1013.) Under section 6255, subdivision (a), a public agency may withhold a public record for policy reasons if it can demonstrate that "on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." As discussed *post*, we conclude that the issue need not be addressed here.

[22] A 2011 consolidated financial statement for Bar Pilots submitted in evidence by PMSA at the trial court indicates that Bar Pilots is "not legally considered a partnership," but has filed partnership tax returns since 1979. Bar Pilots' financial statements filed with the Board are public records. (Regs., § 236.)

each . . . Pilot." The *Miller* Stipulation also provided detailed explanations for the data columns presented in the Pilot Logs.

The *Miller* Stipulation and the attached Pilot Logs for Miller were included as exhibits to PMSA's petition for writ of mandate in the trial court. The Attorney General made written objection to all PMSA exhibits as lacking foundation and authentication, and as hearsay. The Attorney General specifically objected to the "unauthenticated records from a tax court matter" as "irrelevant to any issue presented in this case." The trial court did not conduct an evidentiary hearing, nor did it expressly rule on any of the evidentiary objections by either side. At oral argument before the trial court, the Attorney General again objected to the court's consideration of the *Miller* documents, and argued that the only competent evidence before the court concerning the Pilot Logs was the Port Agent's declaration that he used no such records in the performance of his duties.

In responding to the January 4, 2012 CPRA request, Horton denied that there was any document maintained by the Port Agent named the Pilot Log, but said that "[t]here is a data set that bears headings that are similar to those set forth in your e-mail to [Board counsel] of January 30, 2012." Horton said that the data, however, was not used by the Port Agent in assigning pilots to vessels or in preparing or administering the pilots' vacation schedule and was not supplied to the Board. He insisted that "[t]he documents containing this data are documents that are maintained by [Bar Pilots] in its capacity as a private organization and not in connection with any duties imposed upon the Port Agent by statute or by the regulations of [the Board]." Similarly, in responding to the May 26, 2012 request, the Board replied that it had no Pilot Log in its possession, and the "is not a document prepared, owned, used or retained by [the Board]."

In response to the trial court's disclosure order, on October 12, 2012, Horton submitted another declaration under penalty of perjury reiterating his earlier declaration that, while " 'the Bar Pilots maintain a dataset that includes some of the types of information PMSA apparently seeks through its requests for "Pilot Logs." I do not use this dataset in performing my duties as Port Agent. The dataset is not provided to the

19

Board or to members of the public.' . . . [¶] . . . Some but not all of the information that [PMSA] asserts is contained in the 'Pilot Logs' is used by the Bar Pilots in preparing the report that the Bar Pilots, not the Port Agent, is required to submit to the Board under [Regulations] section 237[, subdivision ](d).  I do not use this information in performing my duties as Port Agent.  Specifically, I do not use the information to assign pilots to vessels, and I do not use it to prepare or administer pilot vacation time. . . . Prior to receiving PMSA's document demands, I was unaware of the existence of the database.  I do not use, and have never used, the database in my capacity as Port Agent.  I am unaware of any previous Port Agent ever using the database for any purpose.  I have never submitted a query to the database (or asked anyone to do so on my behalf) for any purpose, either in my capacity as Port Agent or in my private capacity as President of the Bar Pilots; to my knowledge, no previous Port Agent has ever done so."

2.    *Discussion*

The issue is not whether a database containing some or all of the information requested by PMSA exists.  The Port Agent admits that it does, and that it is owned and used by Bar Pilots.  Nor is the issue an undeniable public interest in safe navigation of vessels in our waterways and avoidance of serious environmental, political, and business consequences that may result from pilot errors.[23]  Rather, the question is whether any

---

[23] PMSA asks us to take judicial notice of four items, including a Board incident review committee report of a near grounding incident near the Richmond wharf on February 18, 2012; news articles concerning a January 7, 2013 allision between an empty oil tanker and a pier of the Bay Bridge; and a copy of the 2012 annual report provided to the Board by Bar Pilots under Regulation section 237, subdivision (d), including the number of exceptions to MRP's.  PMSA contends that the documents (which were not provided to the trial court) demonstrate that the pilot assignment data is utilized by both the Board and the Port Agent, and that they "demonstrate the profound public interest in the information PMSA seeks."  We deny the request because we do not find them relevant.  (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 (*Arce*) [court may decline to take judicial notice of matters that are not relevant to dispositive issues on appeal].)  The Bar Pilots annual report is itself a public record (Regs., § 237, subd. (d)), but that does not thereby make public the records from which the report is produced.  (*Forsham v. Harris* (1980) 445 U.S. 169–171.)  The documents do not address data used by the Port Agent in assigning pilots, and the public interest is a

evidence exists that the information is possessed and used by the Port Agent in the performance of his official duties, and consequently a public record. We find that there is not.

PMSA relied in the trial court, and relies here, on the *Miller* Stipulation and attached Pilot Logs as evidence "of the existence, source and nature of the documents sought under the CPRA and the extent of the Port Agent's role and duties as a public official." But how? PMSA contends that the trial court properly took judicial notice of the *Miller* documents because they are records of a court of the United States and not subject to reasonable dispute. Despite PMSA's assertion to the contrary, the *Miller* Stipulation and the Pilot Logs are unquestionably hearsay, their content was disputed and both the Board and Bar Pilots repeatedly objected to their consideration. PMSA insists that the *Miller* Stipulation and Pilot Logs are not hearsay because they were "not offered for the truth of the matter of the content therein, but to show that, for purposes of CPRA disclosure only, the Pilot Logs exist and reflect the daily activities of the Port Agent to execute his public duties to assign pilots to vessels and to collect data." Even if the Pilot Logs from the *Miller* case could be considered to establish the existence of an information database, statements contained in the *Miller* Stipulation are the only authentication or explanation for any of the information contained within the Pilot Logs, and the only basis for the claim that the Pilot Logs "reflect the daily activities of the Port Agent to execute his public duties to assign pilots to vessels and to collect data." While judicial notice may be taken of court records (Evid. Code, § 452, subdivision (d)), the truth of matters asserted in such documents is not subject to judicial notice. (*Arce, supra,* 181 Cal.App.4th at p. 482.)[24]

---

material factor in determining if an *exemption* to release of public documents otherwise subject to disclosure would apply. (§ 6255.)

[24] See also *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564–1565, quoting 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 47.2: " 'What is meant by taking judicial notice of court records? There exists a mistaken notion that this means taking judicial notice of the existence of facts asserted in *every document* of a court file,

In response to evidentiary objections in the trial court, PMSA asserted that the *Miller* Stipulation "directly admit[s] that the Port Agent's recordation of the assignment of pilots is undertaken in the regular course of business in order to fully and accurately comply with a reporting requirement of the state of California" and that "these statements are directly relevant as admissions against interest, since Miller was and is a member of [Bar Pilots]." But there was no evidence presented that Miller is, or ever has been an officer of Bar Pilots, that he had personal knowledge of any of the business records of Bar Pilots, or that he was authorized in any way to speak on its behalf. And the Stipulation is not even a sworn declaration by Miller. It is the product of yet another layer of hearsay—an unverified document submitted and signed by Miller's counsel, who does not purport to have personal knowledge of any of the content.

In contrast, the Port Agent avers that he does not, and has not, prepared or used the Pilot Logs in assigning pilots, and both the Port Agent and the Board confirm that the database is not provided to the Board. In sum, there is no evidence, let alone substantial evidence, to support a finding that the Pilot Logs are "used by the Port Agent in the execution of his public duties including, but not limited to, assigning pilots to vessels and preparing and administering pilot vacation time" or that they are "necessary and convenient to the Port Agent's public duties." In the absence of such evidence, the database of the Pilot Logs cannot be considered public records under the CPRA.

E.     *Constructive Possession of the Pilot Logs by the Board*

Both PMSA and Amici Curiae argue that records relating to execution of the Port Agent's public duties are also public records because they are in the constructive possession of the Port Agent and the Board. The CPRA pertains to "disclosable public records in the *possession* of the agency . . . ." (§ 6253, subd. (c), italics added.) Relying upon the Board's general administrative control of the Port Agent and its authority over all licensed pilots and pilot reporting requirements (Regs., §§ 218, 219), PMSA insists

including *pleadings* and *affidavits.* However, a court *cannot* take judicial notice of *hearsay allegations* as being true, just because they are part of a court record or file.' "

22

that both the Board and Port Agent have the right to control the Pilot Log database maintained by Bar Pilots, and are therefore in "possession" of those records.

As to the Port Agent, the argument reaches too far. Under PMSA's theory, any and all records held or maintained by a private organization would become public record simply because one of its officers concurrently held a position performing public functions. Whether the record is in the actual or constructive possession of a public official, the requirement is still that the record be required by law to be kept by that official, or that it be " ' "necessary or convenient to the discharge of his official duty." ' " (*San Gabriel Tribune, supra,* 143 Cal.App.3d at p. 774; *CSU, supra,* 90 Cal.App.4th at p. 824.)

As to the Board, to prevail, PMSA must establish that the files (1) qualify as public records and (2) were in the possession of the Board. (*Consolidated Irrigation Dist. v. Superior Court* (2012) 205 Cal.App.4th 697, 709 (*Consolidated Irrigation*).) "Possession" in this context has been interpreted to mean both actual and constructive possession. "[A]n agency has constructive possession of records if it has the right to control the records, either directly or through another person. [Citation.]" (*Id.* at p. 710.) PMSA relies primarily on *Bernardi v. County of Monterey* (2008) 167 Cal.App.4th 1379 (*Bernardi*) in support of its argument. Neither *Consolidated Irrigation* nor *Bernardi* is factually analogous.

In *Consolidated Irrigation*, the petitioner challenged the approval of an environmental impact report (EIR) by the City of Selma (City) and sought a writ of mandate to compel production under the CPRA of, inter alia, records of subconsultants hired by a primary consultant to prepare reports, studies, or certain sections of the EIR. (*Consolidated Irrigation, supra,* 205 Cal.App.4th at pp. 702, 709–710.) The trial court denied the petition. The petitioner contended that the City had the right to control the subconsultants' files based on a provision in the contract between City and the primary consultant that expressly gave the City ownership of all documents and data prepared by the contractor. The petitioner was given access to the contractor's files, and constructive possession of the documents in the contractor's file was not at issue. The court

23

concluded that the contract provision did not give the City ownership rights in the materials in the subconsultant's files and affirmed denial of the petition. (*Id*. at pp. 709–711.) Nothing in the Harbors and Navigation Code, or in the Board's regulations gives the Board any rights of ownership of Bar Pilots' records, and Bar Pilots is not a contractual agent of the Board. As PMSA acknowledges, there is no reference to Bar Pilots in the Harbors and Navigation Code. *Bernardi* dealt only with the reasonableness of an award of attorney fees to a successful CPRA petitioner. The trial court's order requiring production of the environmental consultant's file was not appealed. (*Bernardi, supra,* 167 Cal.App.4th at pp. 1383, 1392.) "An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' [Citations.]" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)

Amici Curiae contend that the Board has the right to obtain the Pilot Log records, and therefore "owns" those records. They cite *San Gabriel Tribune* for the proposition that if an agency delegates a duty to a third party, but retains the power and duty to monitor performance of the delegated duty, the third party records relating to the performance of that duty are public. *San Gabriel Tribune* also involved a contractual agreement, in that instance between a municipality and trash collection service. The trash collection company had a contractual obligation to submit annual financial statements to the city, and the records in dispute consisted of financial data that the company submitted to the city to justify a rate increase the city authorized. (*San Gabriel Tribune, supra,* 143 Cal.App.3d at pp. 767–769.) The court held that those statements were public records subject to disclosure because the contractor had "injected the data into the decision-making process of government" (*id.* at p. 778) and "the City [had] relied on [the statements] in granting the rate increase" (*id.* at p. 775). Here the Board has "delegated" nothing, by contract or otherwise.

PMSA suggests that Board is "outsourc[ing] the 'performance of administrative functions' " and that Bar Pilots "is, in many respects, a functional subordinate of the public agency and subject to the execution of its public duties." Bar pilotage is a recognized but regulated monopoly, and the Board has statutory licensing and oversight

authority. But the individually licensed members of Bar Pilots render piloting services directly to their maritime clients, not on behalf of the Board. The pilot work rules are generally established by Bar Pilots, and not by the Board. And the Legislature has never given the Board the authority to make pilot assignments or to direct them. The Port Agent has always been allocated that responsibility, and we have already held that he serves as a state officer in doing so.

Nor does the record support Amici Curiae's argument that Board is attempting to "defeat disclosure by ceding possession and control of [the records] to a third party." So far as the evidence discloses, the database at issue has always been solely prepared and maintained by Bar Pilots and never provided to the Board, although apparently used in part in preparation of the summary statistical reports from Bar Pilots to the Board required under Regulations section 237, subdivision (d). But the fact that Bar Pilots may use the Pilot Log database to prepare its public summary does not mean that all data used to prepare the report is thereby public. (See *Forsham v. Harris, supra,* 445 U.S. at pp. 171–179 [written data generated, owned and possessed by a privately controlled organization funded solely by federal grants are not records of the federal agency providing the grants if they are not provided to the agency, even if there is a federal right of access to the data].)

F.      *Conclusion*

The evidentiary record before us does not support a finding that the Pilot Log data is, or ever has been, used by the Port Agent in the performance of his official duty in assignment of bar pilots, and consequently a public record. If the data itself is not public record, the fact that the Board could theoretically request it from Bar Pilots does not make it so.

We do not dismiss the public's interest, articulated by PMSA and Amici Curiae, in safe pilotage of large vessels in the environmentally sensitive confines of the San Francisco Bay. We do not doubt that historic records reflecting individual exemptions from what are now only recommended MRP's in piloting assignments may "shed light on

the . . . process of assigning pilots to vessels" as PMSA contends. But records otherwise private do not become public simply by virtue of public interest in their content.

As a consequence of well-publicized maritime accidents, the NTSB has recommended that state licensing boards promulgate "hours of service" rules to prevent pilot fatigue. A legislative committee recently recommended that the Board conduct a manpower utilization study based on actual pilot logs. Our Legislature has now acted on both recommendations, requiring the Board to study the effects of work and rest periods on psychological ability and safety for pilots, and to promulgate pilot regulations establishing requirements for adequate rest periods. (Harb. & Nav. Code, § 1196.5.) Presumably the information that PMSA seeks will come to light in that process.

### III. DISPOSITION

The petition filed in this court, are granted. Let a peremptory writ of mandate issue directing the superior court to set aside and vacate its September 18, 2012 order granting PMSA's petition for writ of mandate and to enter a new and different order denying that petition. The previously issued stay shall dissolve upon issuance of the remittitur. (Cal. Rules of Court, rules 8.490(c), 8.272.) Petitioners shall recover their costs. (Cal. Rules of Court, rule 8.493(a)(1)(A).)


_____
Bruiniers, J.

We concur:


_____
Jones, P. J.


_____
Needham, J.

Superior Court of the City and County of San Francisco, No. CPF-12-512320, Curtis E.A. Karnow, Judge.

Kamala D. Harris, Attorney General, John Saurenman, Assistant Attorney General, Christiana Tiedemann, Deputy Attorney General, for Petitioners in No. A136803.

Phillips, Erlewine & Given, R. Scott Erlewine and Cari A. Cohorn for Petitioners in No. A136806.

No appearance for Respondent.

Flynn, Delich & Wise, Conte C. Cicala; Davis Wright Tremaine, Thomas R. Burke; and Michael C. Jacob for Real Party in Interest.

Ram, Olson, Cereghino & Kopczynski, Karl Olson as Amici Curiae on behalf of Real Party in Interest.