Filed 9/15/22  In re J.W. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.W. et al., Persons Coming Under the Juvenile Court Law. | B317345 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 19CCJP02478A,B |
| Plaintiff and Respondent, | |
| v. | |
| S.W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Conditionally reversed and remanded with directions.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

—————————————

A mother, S.W., appeals the juvenile court's order terminating her parental rights over her two sons. We conditionally reverse and remand to allow the Los Angeles County Department of Children and Family Services and juvenile court fully to comply with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (the Act) and related California law. Undesignated statutory citations are to the Welfare and Institutions Code.

## I

In April 2019, the Department removed five-year-old J.W. and 16-month-old N.W. from the mother.

After one 2-month placement, the boys were placed in June 2019 with a couple who are now their prospective adoptive parents.

When the boys were in their first placement, J.W. avoided contact with the mother. Once, in April 2019, he refused to talk to the mother on the phone. He put his face down and did not speak. Two days later, J.W. refused to get out of bed and then refused to get dressed for a visit with the mother.

There was also an incident of alleged inappropriate behavior by the mother during a visit. During a May 2019 visit, the foster mother saw the mother press her hand with force and pressure on J.W.'s face. The mother then grabbed his ear with pressure. When the mother saw that the foster mother was watching, the mother pretended to caress J.W.'s face. The foster mother told the mother to stop and the mother denied the

2

incident.  J.W. ran to the top of a playground and refused to come down until the mother left.  J.W. appeared angry and sad after the visit.  The foster mother reported he appeared tense before and during other visits with the mother.

The mother denied Indian ancestry.  At an April 22, 2019, detention hearing, the court found there was no reason to know the children were Indian children.

In June 2019, the juvenile court sustained allegations that the mother's female partner physically abused the children and the mother failed to protect the children.

In spring 2020, the mother told the Department her half sister "is Native American so she gets a check and she pays for" the mother to stay at a motel.  The Department had a meeting with this maternal aunt, but there is no evidence it asked her about Indian ancestry.

The Department communicated with the maternal grandmother several times.  There is no evidence it asked her about Indian ancestry.

On December 15, 2020, the juvenile court terminated the mother's reunification services.

In a status review report filed May 27, 2021, the Department said the children "seem to enjoy" visits with the mother.

The court held a section 366.26 hearing on December 14, 2021.

By this time, the boys had spent about two years and eight months out of the mother's custody.  J.W. was eight years old and N.W. was nearly four years old.

The Department asked the court to admit three documents for the hearing:  an April 2021 section 366.26 report, a November

3

2021 status review report, and a December 2021 last minute information.

The April 2021 report said the mother was consistent with visiting her children. She participated in monitored visits every Saturday for two hours at locations such as parks, restaurants, or playgrounds. She also had monitored calls and video calls during the week.

According to this report, the mother said she did not want the children to be adopted, "being that both kids want to be with me and it would be in their best interests for us to have a relationship." She said she wanted kinship guardianship with her mother.

The November 2021 report repeated that the mother consistently attended weekly monitored visits every Saturday for two hours at locations such as parks, restaurants, or playgrounds. It also noted that the mother tried to coach J.W. to say he wanted to live with his maternal grandmother.

J.W. and N.W. told a Department social worker they enjoyed living with the foster parents. J.W. said he loved being in their home and N.W. said he loved living with the prospective adoptive parents, whom he called his "mama and papa."

The mother and the prospective adoptive parents were creating a mediated postadoption agreement that would allow visitation between the mother and the children. The prospective adoptive parents said they wanted a fair outcome and wanted the mother to continue a relationship with the boys.

The December 2021 last minute information said the mother and the prospective adoptive parents had drafted a postadoption agreement, but they had not finalized it yet.

At the section 366.26 hearing, the mother did not call witnesses or introduce evidence. She said the parental-benefit exception applied. Her counsel's complete argument on this issue was: "Mother has maintained regular and consistent visitation throughout the case." The mother also asked the court to continue the matter until the mother and the prospective adoptive parents finalized the postadoption agreement. If the court did not continue the matter, "[W]e would object to the termination of parental rights."

At the Department's request, and with no objection by the mother, the court admitted the three documents and took judicial notice of the case file. The Department and counsel for the boys asked the court to terminate the mother's parental rights and asserted no exception to adoption applied.

The court found no exception to adoption and terminated the mother's parental rights.

## II

## A

The trial court's finding that no exception to adoption applied was proper.

At the section 366.26 hearing, the focus is on the best interests of the child, and the default option is adoption. (*In re Caden C.* (2021) 11 Cal.5th 614, 631–632 (*Caden C.*).) The mother invoked a statutory exception to this rule: the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) This limited exception recognizes that, despite children being outside parents' custody, the harm to children of severing a strong bond with their parents may outweigh the benefits of adoption. (See *Caden C.*, *supra*, at pp. 631, 633–634.)

To prove the parental-benefit exception, parents must establish: (1) they visited the children regularly; (2) there is a "substantial, positive, emotional attachment" between them and the children; and (3) terminating this attachment would be detrimental to the children. (*Caden C.*, *supra*, 11 Cal.5th at p. 636; see also *id*. at p. 631.)

We review the first two elements for substantial evidence and the third element for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

The mother says the court abused its discretion by proceeding with the section 366.26 hearing because the adoption assessment report was inadequate and did not include the amount and nature of contact between her and her sons. This contention lacks merit.

The mother said nothing about the adequacy of the report in the juvenile court and therefore waived this contention. (See *In re M.M.* (2022) 81 Cal.App.5th 61, 67–68 (*M.M.*).)

The mother is also incorrect because the report included information about the amount and nature of her contact with her sons. The Department reported that the mother had monitored two-hour visits once a week at various locations in the community, as well as monitored calls and video calls during the week. The Department's reporting was not exhaustive, but it did provide information about the mother's contact with the boys.

Though the mother's appellate argument centers on the report's adequacy, because she generally attacks the court's finding that the exception does not apply, we review the three elements of the finding.

6

The mother proved the first element: she visited her sons regularly. She did not prove the second and third elements. She made no argument about them at the section 366.26 hearing.

As to the second element, there is not substantial evidence that there was a "substantial, positive, emotional attachment" between the mother and her sons. The mother offered no testimony or evidence about this. There was evidence against the existence of this bond. At the time of the hearing, N.W. was nearly four years old and had spent most of his life away from the mother. J.W. was eight years old and had spent a substantial portion of his life away from her. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [second element factors include age of child and portion of child's life spent in parent's custody].) There was also evidence the mother tried to manipulate J.W. Although the sons said they loved living with the prospective adoptive parents, the mother used her visits to try to coach J.W. to say he wanted to live elsewhere. This, together with earlier evidence that J.W. had avoided visits with the mother and the mother pressed his face and grabbed his ear during a visit, tended to show the relationship did not have a positive effect on the boys.

The juvenile court did not abuse its discretion in balancing the harms and benefits of adoption. Both J.W. and N.W. spent significant portions of their lives outside the mother's custody. And the record demonstrates some negative aspects of the mother's interactions with J.W. On the other hand, the boys reported enjoying living with the prospective adoptive parents, who provided them with stability. The court's decision was not arbitrary, capricious, or absurd. (See *Caden C.*, *supra*, 11 Cal.5th at p. 641.)

7

In her reply brief, the mother says the trial court did not, and impliedly we should not, consider earlier evidence, like the evidence J.W. avoided the mother and the mother grabbed his ear during a visit. Her reasoning is based on this evidence being outside the three records the juvenile court admitted for the section 366.26 hearing. The juvenile court judicially noticed *its own* file in the case. We have no reason to think the court did not consider the context the file offered. The records at issue are part of our appellate record and we may consider them on review.

The mother cites *Board of Pilot Commissioners v. Superior Court* (2013) 218 Cal.App.4th 577, but the issue there was about taking judicial notice of records from *another* court and those records were "unquestionably hearsay, their content was disputed, and [the opposing party] repeatedly objected to their consideration." (*Id.* at p. 596.) The records in this case were from the same court, involved the same case, and the mother did not object to the court taking judicial notice of the file.

Our reasoning is consistent with *In re L.A.-O.* (2021) 73 Cal.App.5th 197, in which the court refused to reverse a termination order based on facts from an earlier report that the parent never asked the juvenile court to consider. (*Id.* at pp. 207–208.) The Court of Appeal in *In re L.A.-O.* did not say the juvenile court took judicial notice of the case file. Furthermore, the reasoning in that case relied on the impropriety of a party citing earlier reports for reversal if the party did not identify those reports in the juvenile court. This is dissimilar from using earlier reports to determine if substantial evidence *supports* the juvenile court's decision.

The mother points to other cases that are inapposite. Her case is unlike *In re D.M.* (2021) 71 Cal.App.5th 261. The father

8

in that case testified at his hearing. He said his children did not want to leave at the end of his twice-weekly visits, one child would cry when visits ended, and the children told him they wanted to live with him. (*Id.* at pp. 267–268.) The appellate court also found the juvenile court relied on factors *Caden C.* found inappropriate. (*Id.* at p. 271.) In this case, the mother offered no testimony or evidence and there is no indication the juvenile court relied on inappropriate factors.

The same is true of *In re B.D.* (2021) 66 Cal.App.5th 1218, where the Court of Appeal found the juvenile court considered improper factors. (*Id.* at p. 1230.)

The mother also cites *In re J.D.* (2021) 70 Cal.App.5th 833, which explained that though it is not the agency's burden to disprove the parental-benefit exception, by the time the juvenile court schedules a section 366.26 hearing, the agency's earlier reports should have provided objective, disinterested information about the quality of children's attachment to their parents. (*Id.* at p. 861.) Here, earlier reports did provide information about this attachment. For example, reports described J.W.'s avoidance of the mother, related the incident in which the mother grabbed J.W.'s ear, and acknowledged the children seemed to enjoy visits.

In sum, the mother waived her challenges about the Department's reporting and the juvenile court correctly found the mother did not prove the parental-benefit exception.

B

As the Department concedes, it erred by not asking the mother's extended family members about the boys' potential Indian ancestry. (See § 224.2, subds. (a) [Department and court have an affirmative and continuing duty to inquire] & (b) [initial

9

inquiry duty includes asking extended family members whether child may be an Indian child].)

The deficient inquiry was prejudicial. Appellate courts have split on the proper standard to assess prejudice. (See *M.M.*, *supra*, 81 Cal.App.5th at p. 71 [describing standards].) The mother's half sibling was Native American and there was no evidence about the source of this ancestry. The Department had contact with the maternal grandmother and the half sibling, but never inquired of either family member. Following most prejudice standards, this was prejudicial. There was readily obtainable information likely to bear meaningfully on whether J.W. and N.W. were Indian children (see *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744) and the record of the proceedings suggested a reason to believe they were Indian children (see *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779). A majority of this division has rejected the reversible per se approach (*M.M.*, *supra*, 81 Cal.App.5th at p. 71), but this approach would also find prejudice here. The defective inquiry was prejudicial.

To support its argument that the error was harmless, the Department says "it appears" the juvenile court inquired of at least one extended family member, the potential adoptive father. This is erroneous.

The potential adoptive parents are not extended family members. Department records called the placement a non-relative placement. In its appellate brief, the Department says, "It was later clarified" that the prospective adoptive parents were extended family members. The Department cites a page of the Clerk's Transcript that reports that, according to a social worker, the prospective adoptive mother said she was an extended family member. Although the Department's briefing does not explain

10

the nature of this relationship, the record reveals this information. Two pages after the page the Department cites is a letter in which the prospective adoptive parents explain they are *not* biologically related to the boys. They are the aunt and uncle of the mother's female partner from the beginning of the case. The partner was not a party to the case and was not designated as a parent to the boys. The potential adoptive parents were not extended family members within the meaning of the Act (see 25 U.S.C. § 1903(9)), so the Department's inquiry of one of them does not prove the deficient inquiry was harmless.

The Department says it "seems apparent" the mother's half sister's ancestry flowed from the half sister's father, but there is no evidence to support this aside from the mother's earlier denial of ancestry.

We find prejudice from the lack of inquiry of the mother's half sister and the maternal grandmother.

## DISPOSITION

The order terminating the mother's parental rights of J.W. and N.W. is conditionally reversed. The matter is remanded to the juvenile court with directions to comply with the inquiry provisions of Welfare and Institutions Code section 224.2. The juvenile court shall order that within 30 days of the remittitur, the Department perform its initial inquiry of J.W. and N.W.'s potential Indian ancestry consistent with this opinion. If, after completing the initial inquiry, there is no reason to believe the children are Indian children, the court shall reinstate its order terminating parental rights.

If the inquiry produces any additional information substantiating Indian ancestry, the Department and the Court shall proceed accordingly under the Act and related California

11

law, including complying with the Act's notice provisions.  In the event new notice is given and no tribe responds indicating J.W. and N.W. are Indian children within the meaning of the Act, or no tribe seeks to intervene, the court shall reinstate the order terminating parental rights.


                                        WILEY, J.

We concur:


        STRATTON, P. J.


        GRIMES, J.